# [J-13A&B & 14A&B-2013]
# IN THE SUPREME COURT OF PENNSYLVANIA
# EASTERN DISTRICT

## CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, : | No. 631 CAP |
| : | |
| Appellant : | Appeal from the Order entered on August |
| : | 26, 2011 by the Court of Common Pleas, |
| v. : | Criminal Division, of Philadelphia County |
| : | at No. CP-51-CR-1031751-1988 |
| HENRY DANIELS, : | |
| : | |
| Appellee : | SUBMITTED:  February 12, 2013 |
| : | |
| COMMONWEALTH OF PENNSYLVANIA, : | No. 632 CAP |
| : | |
| Appellee : | Appeal from the Order entered on August |
| : | 26, 2011 by the Court of Common Pleas, |
| v. : | Criminal Division, of Philadelphia County |
| : | at No. CP-51-CR-1031751-1988 |
| HENRY DANIELS, : | |
| : | |
| Appellant : | SUBMITTED:  February 12, 2013 |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | |
| COMMONWEALTH OF PENNSYLVANIA, : | No. 633 CAP |
| : | |
| Appellant : | Appeal from the Order entered on August |
| : | 26, 2011 by the Court of Common Pleas, |
| v. : | Criminal Division, of Philadelphia County |
| : | at No. CP-51-CR-1031752-1988 |
| KEVIN PELZER, : | |
| : | |
| Appellee : | SUBMITTED:  February 12, 2013 |
| : | |
| : | |
| COMMONWEALTH OF PENNSYLVANIA, : | No. 634 CAP |

|  | : |  |
|---|---|---|
| Appellee | : | Appeal from the Order entered on August |
|  | : | 26, 2011 by the Court of Common Pleas, |
|  | : | Criminal Division, of Philadelphia County |
| v. | : | at No. CP-51-CR-1031752-1988 |
|  | : |  |
|  | : |  |
|  | : |  |
| KEVIN PELZER, | : |  |
|  | : |  |
| Appellant | : | SUBMITTED: February 12, 2013 |

## OPINION

**MR. CHIEF JUSTICE CASTILLE**                    **DECIDED: October 30, 2014**

These twin capital cross-appeals involve co-defendants Henry Daniels and Kevin Pelzer ("Daniels" and "Pelzer," or collectively "appellees") and represent a continuation of their first collateral challenges to their convictions under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. By Opinion filed on January 23, 2009, this Court vacated the PCRA court's March 25, 2003 order, which had granted appellees a new trial. The Court reviewed three claims of trial counsel ineffectiveness, denied relief on all three claims, and remanded the case to the PCRA court for the preparation of an opinion addressing the remainder of appellees' claims. Commonwealth v. Daniels and Pelzer, 963 A.2d 409 (Pa. 2009). On remand, the PCRA judge having retired, a new judge ordered a new penalty proceeding for each appellee, while denying guilt phase relief. The PCRA court explained its reasoning in an opinion dated November 22, 2011.

The Commonwealth appeals from the grant of penalty phase relief in each case, while appellees, in separate cross-appeals, seek review of additional issues upon which the PCRA court denied relief. For the reasons set forth below, we affirm the order of the PCRA court as it relates to Kevin Pelzer, but reverse the order as it relates to Henry

Daniels. Thus, Pelzer is denied guilt phase relief, but the award of a new penalty phase hearing to him is affirmed, and Daniels's PCRA petition is dismissed in its entirety.

The facts and procedural history are not recounted at length given that a full history of the case was set forth in our initial review of these collateral proceedings in Daniels and Pelzer, and in the direct appeal opinions reported at Commonwealth v. Daniels, 612 A.2d 395 (Pa. 1992) (Opinion in Support of Affirmance) and Commonwealth v. Pelzer, 612 A.2d 407 (Pa. 1992) (Opinion in Support of Affirmance).

As relevant here, appellees were tried jointly before a jury. Daniels was represented at trial by Charles Houston, Esquire, a South Carolina lawyer hired by Daniels's family and granted *pro hac vice* status, with John Drost, Esquire, a Pennsylvania attorney and Daniels's original trial counsel, appointed as standby counsel. Pelzer was represented by Donald Padova, Esquire. Appellees obtained new counsel for purposes of their direct appeals. All prior counsel testified during the PCRA hearings with the exception of Mr. Houston.

The guilt phase evidence established that appellees participated in a plan to kidnap and hold for ransom sixteen-year-old Alexander Porter. Appellees kidnapped the victim, bound and gagged him, and placed him in the trunk of his car. Ultimately, they determined to kill the victim. In all, the victim was held in the trunk for twenty-four hours. According to appellees' police statements and Daniels's trial testimony, appellees were unable to determine whether the youth was dead when they went to dispose of his body. Pelzer shot Porter four times in the back of the neck to remove all doubt. The jury found both appellees guilty of first-degree murder and other offenses.

Following a capital penalty hearing, the jury found the same four aggravating circumstances and two mitigating circumstances with regard to each appellee and further found that the aggravating circumstances outweighed the mitigating

circumstances; accordingly, the jury fixed the murder penalty at death for each appellee. See 42 Pa.C.S. § 9711(c)(1)(iv). The trial court formally imposed the sentences of death on November 14, 1989. On April 23, 1990, the trial court sentenced each appellee to an aggregate, consecutive term of twenty-five to fifty years in prison for his remaining crimes. The Supreme Court affirmed the sentences of death on direct appeal. Daniels, 612 A.2d at 397-98; Pelzer, 612 A.2d at 410. Daniels filed for reconsideration, which was granted. Subsequently, the Court again affirmed the judgment of sentence, this time by a 4-3 majority vote. Commonwealth v. Daniels, 644 A.2d 1175 (Pa. 1994) (*per curiam*).

Appellees filed timely *pro se* PCRA petitions and new counsel entered their appearances and filed amended petitions, which were followed by many supplemental petitions. The PCRA petitions were assigned to the Honorable James A. Lineberger, because the trial judge was no longer sitting on the bench, and Judge Lineberger considered the cases together.

The PCRA court held a hearing at which it reviewed the twenty-one collective claims submitted by appellees. The court granted an evidentiary hearing on seven claims and granted the Commonwealth's Motion to Dismiss the remaining claims. The seven issues to be considered at the evidentiary hearing were: (1) trial counsel ineffectiveness for failing to object to the trial court's instruction on accomplice liability, (2) trial counsel ineffectiveness for failing to adequately investigate and present evidence on the cause of death, (3) a jury selection challenge under Batson v. Kentucky, 476 U.S. 79 (1986), (4) trial counsel ineffectiveness for failing to present mitigation evidence, (5) allegations related to appellate counsels' performance, (6) a general request regarding the application of relaxed waiver, and (7) Daniels's challenge to the propriety of the Section 9711(d)(6) (perpetration of a felony) aggravating

circumstance under Commonwealth v. Lassiter, 722 A.2d 657 (Pa. 1998) (plurality decision). See N.T., 2/2/2000, at 80-89.

After holding hearings on these claims in December of 2001, May of 2002, and January of 2003, the PCRA court granted new trials based on the guilt phase claims that trial counsel were ineffective for (1) failing to object to the trial court's instruction on accomplice liability, and (2) failing to present evidence disputing the cause of death. The PCRA court also addressed the Batson claim, but denied relief; the court did not provide a reasoned analysis of the myriad other claims.

The parties filed cross-appeals after the PCRA court ruled that its order was final and appealable. See Daniels and Pelzer, 963 A.2d at 416. On appeal, this Court reviewed the three claims addressed by the PCRA court, ultimately reversing the grant of relief on the two guilt phase ineffectiveness claims, while agreeing with the dismissal of the Batson claim. We therefore reversed the PCRA court's grant of new trials. We were unable to reach the other claims raised on appellees' cross-appeals, however, given the PCRA court's failure to discuss the claims, a lapse that precluded meaningful appellate review. We thus remanded for a merits opinion. Since the intention of our remand is now disputed, we will set forth our directive *verbatim*:

> Finally, appellees raise numerous other claims which, though dismissed by the PCRA court, were not addressed by the PCRA court on the merits either in its opinion or elsewhere on the record. For example, in its opinion, the PCRA court acknowledged that appellees raised other claims of error in connection with the penalty phase of the trial, but stated that those claims were rendered moot because of its decision to grant a new trial, and thus dismissed them. Given the prospect of appellate review, and to avoid piecemeal review, PCRA courts in capital cases should be thorough and should address all issues. In light of our disagreement with the PCRA court's existing grant of relief, the proper course is to remand for the PCRA court to address these claims.

In addition, the PCRA court failed to explain the basis for its determination that appellees' many other claims affecting the guilt phase were meritless. Because of the PCRA court's failure, we have no rationale supporting the denial of appellees' remaining claims and cannot conduct meaningful appellate review. Under such circumstances, we will remand the matter to the PCRA court to write an opinion addressing all of the PCRA petitioner's claims. … Accordingly, we remand this matter to the PCRA court to furnish a written opinion on the remaining claims raised by appellees in their petitions for post-conviction relief, including those claims that it previously dismissed without a hearing. As to any claims requiring resolution of disputed material facts, the court should include specific factual findings and express credibility judgments.

Id. at 435 (citations omitted). Appellees' Applications for Reargument were denied.

On remand, the case was assigned to the Honorable Carolyn Engel Temin because Judge Lineberger was no longer serving. Judge Temin held several hearings between December 10, 2010 and August 26, 2011, to determine which issues remained to be addressed. The parties disputed whether Judge Lineberger had dismissed on the merits the four remaining claims encompassed in his grant of an evidentiary hearing. The Commonwealth asserted that the claims were dismissed as meritless, while appellees asserted that dismissal was premised upon mootness. Judge Temin ultimately concluded that Judge Lineberger's June 2004 opinion "definitely states that the remaining issues were dismissed as moot," and thus she reconsidered the claims "*ab initio*." PCRA court Slip Op., 11/22/11, at 4. The court ultimately addressed seven guilt phase claims, seven penalty phase claims, and a cumulative prejudice claim, concluding that trial counsel for each appellee were ineffective for failing to investigate and present additional mitigation evidence specific to their client, but that appellees were not entitled to relief on their remaining claims. Accordingly, the PCRA court awarded each appellee a new penalty phase hearing. These twin cross-appeals followed.

## I.    PRELIMINARY PROCEDURAL ISSUE

The parties first dispute the propriety of the successor PCRA court's decision to consider claims on remand anew.  The Commonwealth argues that Judge Temin had no authority to vacate the death sentences because in doing so she overruled Judge Lineberger's prior dismissal.    That action, the Commonwealth alleges, violated Pa.R.A.P. 2591, which provides that the lower court must proceed in accordance with the judgment or order of the appellate court on remand, as well as the coordinate jurisdiction rule, which provides that judges sitting on the same court in the same case should not overrule each other's decisions.  The Commonwealth contends that this Court's remand order was narrow, merely directing the PCRA court to produce a written opinion on the remaining issues it had dismissed, and Judge Temin exceeded that mandate when she granted penalty phase relief.  Respecting coordinate jurisdiction, the Commonwealth posits that Judge Lineberger specifically rejected appellees' mitigation-based ineffectiveness claim on the merits during a March 25, 2003 PCRA hearing and then memorialized the decision in an order dated the same day.  According to the Commonwealth, the coordinate jurisdiction rule precluded Judge Temin from overruling the merits determination of a fellow PCRA judge.

The Commonwealth further argues that Judge Lineberger's June 2004 written opinion, which stated that the claims he did not address in the opinion were "moot," is not part of the record on appeal, and therefore Judge Temin should not have considered its contents in determining whether she could address the merits "*ab initio*." The Commonwealth concludes that "because the PCRA court lacked the authority to go beyond this Court's narrow remand order and overrule the prior binding decision of a judge of coordinate jurisdiction, the court's *ultra vires* award of a new penalty phase hearing should be reversed."  Principal Brief of Commonwealth, at 26.

Pelzer responds that in the June 2004 opinion, Judge Lineberger stated that he deemed appellees' penalty phase issues "moot" because of his determination that a new trial was warranted. See PCRA court Slip Op., 6/29/2004, at 12. Pelzer adds that this Court recognized that the claims were dismissed as moot in our remand directive (quoted above). According to Pelzer, the Court remanded the case specifically because certain claims remained unaddressed by the PCRA court. It follows, Pelzer says, that the coordinate jurisdiction rule was not violated by Judge Temin because Judge Lineberger did not decide the merits of the remaining claims. Pelzer further contends that the cases cited by the Commonwealth to support its argument that Judge Lineberger's opinion is not part of the record are inapplicable because they stand for the proposition that facts stated in an opinion cannot overcome the lack of record evidence to support the existence of those facts, a proposition not at issue here. Daniels's arguments largely echo those of Pelzer.

The circumstances here are not optimal, even aside from the unavailability of the original PCRA judge to conduct the remand proceeding. This Court has too often seen capital PCRA matters where the court below, faced with a multitude of claims and prolix amendments, addresses a claim or two, grants relief, and then fails to discharge its duty to address at all, or to address fully, the remaining claims, a circumstance that can lead to piecemeal review, multiple appeals to this Court, and accompanying delay. See, e.g., Commonwealth v. Sneed, 899 A.2d 1067 (Pa. 2006) (reversing PCRA grant of new trial on single guilt phase claim, while affirming grant of penalty relief), followed by Commonwealth v. Sneed, 45 A.3d 1096 (Pa. 2012) (deciding remaining guilt phase claims following remand and further appeal). See also Daniels and Pelzer, 963 A.2d at 435 (collecting cases). Our remand in this case illustrates that we have not hesitated in such circumstances to remand either for a fuller explanation of the rejection of claims, or

for a fuller treatment of claims, since the circumstance impedes the Court's ability to conduct meaningful appellate review.

In this case, the original PCRA judge gave conflicting signals, as he actually dismissed appellees' other claims, signaling a merits disposition that allowed for appealable orders, and further suggested, as relevant here, that he was not necessarily convinced by the ineffectiveness respecting mitigation claim, but then suggested in his opinion that the dismissal was on mootness grounds. The suggestion of mootness was plainly misguided in light of this Court's repeated insistence on a comprehensive approach to PCRA petitions. A capital PCRA petitioner's claims should not be deemed "moot" by the trial court based upon a determination that a claim or two possesses merit; any finding of mootness would depend upon this Court's determination of any ensuing Commonwealth's appeal. As an institutional matter, and as a matter of judicial economy, mootness is more properly for this Court to determine in capital PCRA proceedings. If a single collateral issue is both contested (as here) and deemed of such importance as to warrant immediate interlocutory review in the PCRA court context, the PCRA court can avail itself of the issue certification process, Pa.R.A.P. 312 (interlocutory appeals by permission). But, a PCRA trial court should not invoke "mootness" to avoid the task of deciding the entire case before it so as to make for a ready, comprehensive, and timely single appeal. This imperative is not just a matter of sparing the parties and this Court the burden of multiple, "ping-ponging" appeals but it also avoids the prospect – as happened here – of the PCRA judge no longer being available to preside over any remand.

The parties' dispute over the proper interpretation of Judge Lineberger's handling of the remaining claims is ultimately of little moment to the appellate task of this Court. Even if Judge Lineberger had made it perfectly clear that he was rendering a merits

conclusion as to every claim, that fact would hardly advance the purpose of our remand. The impediment to meaningful appellate review was the absence of any reasoned expression why any particular claim was being rejected. Judge Lineberger denied most of appellees' claims without an evidentiary hearing. See N.T., 2/2/2000, at 80-89. He then held multiple hearings related to specific claims, including both the guilt phase claims that were subject of the prior collateral appeal and the penalty phase claim upon which Judge Temin ultimately granted relief. When Judge Lineberger granted relief on the two guilt phase claims, the prosecutor stated that he "would assume all the other claims are denied." Judge Lineberger replied, "No. What I'm saying to you, is this. I didn't go down the list of claims on there…. Some of those issues that were raised did not trouble me at all…." N.T., 1/29/03, at 11. But, the court did not identify these claims or articulate the reasons he believed they were not troubling. During a March 5, 2003 hearing, Judge Lineberger appeared reluctant to rule on the merits of the penalty phase issues because he had not fully considered them. See 3/5/03, at 5, 12-15 ("See, I'm in a position at this moment where I really did not give the issues raised concerning the penalty phase probably the consideration they might have legally deserved…."). Ultimately, on March 25, 2003, the court appeared to deny relief on the mitigating evidence claims on the merits, but again without any kind of reasoned expression, and in an equivocal manner tied to a hope that the penalty phase issues would be rendered "academic" by his granting of new trials: "[S]o I guess what I'm saying is this, gentlemen, that in this Court's opinion the conduct of the lawyers were not an F. Lee Bailey type presentation on the part of Houston, but in my opinion it does not warrant another penalty phase should the Commonwealth overcome the threshold on its appeal of this Court's decision on the new trial. Hopefully the question will be academic." N.T.,

3/25/03, at 14.  The court's subsequent reference to mootness in its opinion seems to continue its equivocation.

What is not equivocal is that the initial PCRA judge memorialized no findings of facts or specific conclusions of law as to the various claims he dismissed, and he offered no reasoned explanation as to any of the claims; an offhand reference to Attorney F. Lee Bailey is not helpful to meaningful appellate review.  We are left with nothing of substance from Judge Lineberger to review, irrespective of whether the judge intended to engage the merits.  In these circumstances, Judge Temin, tasked with providing this Court with a reasoned analysis of the myriad remaining claims, can hardly be faulted for proceeding to analyze the claims *de novo*: there was nothing material for Judge Temin to defer to, and she was no better off than this Court, when the appeal was here before, to try to fathom the grounds for Judge Lineberger's decisions (or non-decisions).  Our remand order did not contemplate a circumstance where the judge who had failed to fully discharge his duty in the first instance would be unavailable to complete the task upon remand.  Hence, at least in these admittedly unique circumstances, we see no error in the judge to whom the case was reassigned examining the merits anew, so as to provide this Court with the explication necessary for us to discharge our appellate task.  Thus, we will proceed to the merits.

## II.    REVIEW STANDARDS

In reviewing the rulings of a PCRA court, we examine whether the PCRA court's determination "is supported by the record and free of legal error."  Commonwealth v. Rainey, 928 A.2d 215, 223 (Pa. 2007).  In order to be eligible for PCRA relief, a petitioner must establish by a preponderance of the evidence that the conviction or sentence resulted from one or more of the enumerated circumstances found in 42

Pa.C.S. § 9543(a)(2), and that the allegation of error has not been previously litigated or waived. Id. § 9543(a)(3). A claim is previously litigated if the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue. Id. § 9544(a)(2). An allegation is waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state postconviction proceeding." Id. § 9544(b).

The majority of appellees' claims sound in ineffective assistance of counsel under the Sixth Amendment. The U.S. Supreme Court has stressed that there is a strong presumption that counsel was effective, and the burden of overcoming the presumption rests with the defendant. See Burt v. Titlow, ___ U.S. ___, 134 S.Ct. 10, 17 (2013); Strickland v. Washington, 466 U.S. 668, 690 (1984). To obtain relief, the defendant must demonstrate that counsel's performance was constitutionally deficient and that the deficient performance prejudiced him. Strickland, 466 U.S. at 687. In Pennsylvania, we have applied the Strickland test by looking to three elements, two concerning performance, and one concerning prejudice. Respecting counsel's performance, the petitioner must establish that his underlying claim is of arguable merit and that no reasonable trial strategy existed for counsel's action or inaction. Commonwealth v. Pierce, 527 A.2d 973, 975 (Pa. 1987). The reasonableness of counsel's conduct is objectively measured, Cullen v. Pinholster, ___ U.S. ___, ___, 131 S.Ct. 1388, 1404, 1407 (2011) (citing Harrington v. Richter, 562 U.S. ___, ___ , 131 S.Ct. 770, 791 (2011)). Respecting prejudice, we employ the Strickland actual prejudice test, which requires a showing of a reasonable probability that the outcome of the proceeding would have been different but for counsel's constitutionally deficient performance. See, e.g., Strickland, 466 U.S. at 694; Commonwealth v. Sepulveda, 55 A.3d 1108 (Pa. 2012). "[A] reasonable probability is a probability that is sufficient to

undermine confidence in the outcome of the proceeding." Commonwealth v. Spotz, 84 A.3d 294, 312 (Pa. 2014) (citations omitted); see also Hinton v. Alabama, ___ U.S. ___, 134 S.Ct. 1081, 1089 (2014) ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.") (quotation marks omitted); Strickland, 466 U.S. at 695 (explaining same concept in context of penalty relief). A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim. Commonwealth v. Sneed, 899 A.2d 1067, 1076 (Pa. 2006).

Both Daniels and Pelzer were represented by new lawyers on direct appeal, and those direct appeals were litigated before this Court's decision in Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002), *reargument denied,* 821 A.2d 1246 (Pa. 2003). Thus, in theory, direct appeal counsel in each case could have raised claims of trial counsel ineffectiveness on direct appeal, and the failure to raise a claim of trial counsel ineffectiveness on direct appeal could implicate PCRA waiver.[1] As a consequence, to the extent that appellees on collateral attack now raise claims deriving from the alleged ineffectiveness of trial counsel, those particular claims must be "layered," *i.e.*, appellees must prove Strickland ineffectiveness as to both trial counsel and appellate counsel in order to demonstrate an entitlement to PCRA relief. Commonwealth v.

---

[1] Until 2002, this Court required new counsel to raise claims of previous counsel's ineffectiveness at the first opportunity after new counsel was appointed, which was often on direct appeal. Commonwealth v. Hubbard, 372 A.2d 687 (Pa. 1977). This rule was subsequently abrogated in Grant, which held that claims of ineffective assistance of counsel generally should be deferred until collateral review. 813 A.2d at 738 (overruling Hubbard); see also Commonwealth v. Pagan, 950 A.2d 270, 287 (Pa. 2008). Thus, in direct appeals decided prior to Grant, such as these, new counsel on appeal would have been obligated to raise claims of trial counsel ineffectiveness or risk having them later be deemed waived for purposes of collateral review.

Walker, 36 A.3d 1, 7 (Pa. 2011); Commonwealth v. McGill, 832 A.2d 1014, 1022 (Pa. 2003).

Recognizing the dynamism that has continued to be evident in this area of the law since Grant and McGill,[2] this Court in Walker recently explained that a remand for further explication of the appellate counsel aspect of a layered ineffectiveness claim continues to be available. Specifically, we explained that an appellate court should not simply reject a claim of appellate counsel ineffectiveness based upon deficiencies in the appellate brief if the deficiencies in the brief "mirror those in the PCRA pleadings, unless the PCRA court invoked these deficiencies as the basis for its decision and afforded an opportunity for amend." We then explained that a remand remained "an option" to correct pleading and proof deficiencies and that we will continue to "review the underlying claim concerning trial counsel's stewardship to determine whether remand for further development" of appellate counsel ineffectiveness claims is necessary. However, we reiterated that, in the layered claim scenario, a remand remains unnecessary if the petitioner has not met his burden of establishing the underlying claim of trial counsel ineffectiveness. Walker, 36 A.3d at 8-9.

Thus, in this case, for appellees to secure relief on any particular claim, they must establish Strickland's elements as to both trial and appellate counsel. To the extent that this Opinion discusses appellees' underlying claims of alleged trial court error or trial counsel ineffectiveness, we do so purely for purposes of assessing appellees' derivative and cognizable claims of appellate counsel ineffectiveness, and in particular, to assess whether a Walker-style remand is required.

---

[2] McGill, in addition to addressing the circumstance of layered claims of ineffectiveness, also spoke to the prospect of associated remands in cases then pending in the appellate courts. These appeals were not then pending, and we look to the more recent pronouncement in Walker, discussed infra.

## III. GUILT PHASE ISSUES

We first address the guilt phase claims that are the subject of appellees' cross-appeals, since they offer the prospect of the greatest relief.

### A.

Appellees allege that the Commonwealth failed to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), identifying three items of exculpatory evidence they say were withheld from them. First, they cite a "body receiving record" prepared by the medical examiner, which indicated that Alexander Porter had died "eight or nine hours *before* the gunshots were fired." Brief of Daniels at 30 (original emphasis). Appellees aver that this document supports a theory that Porter died in the trunk of the car while they were sleeping. Second, appellees cite witnesses' statements that they heard gunshots in the park area where the victim's body was found between 11 p.m. and 1 a.m. on the night of the murder. Third, appellees cite a forensic report stating that no bloodstains were found in their vehicle; appellees say this report was exculpatory because it proved the falsity of a police officer's statement at trial that blood was found in the vehicle.

According to appellees, the collective import of this withheld information was significant because it refuted the Commonwealth's trial theory, which was that the victim was shot and killed at the park. Appellees say the evidence tended to support Judge Lineberger's belief, in granting guilt phase relief, that the victim was dead by the time he was brought to the park and shot four times. Repeating the argument they made on the first collateral appeals, appellees contend that the defense forensic evidence at the PCRA hearing established that the victim was already dead by the time they arrived at the park. Proof that the victim was already dead when Pelzer shot him, appellees aver,

would undermine the Commonwealth's proof of their specific intent to kill. Pelzer also argues that this evidence corroborated his statement to the police that the victim was already dead when he shot him at the park. Additionally, appellees contend that the Brady material would have further supported the defense objection to the trial court's instruction that a specific intent to kill could be inferred from the use of a deadly weapon upon a vital part of the victim's body.

Appellees acknowledge that their initial collateral appeals posed a central issue related to trial counsels' alleged ineffectiveness for failing to contest the cause of death. The Court rejected the issue on the basis that appellees could not demonstrate prejudice because the entire circumstances surrounding the kidnapping and binding of the victim, and then holding him in the trunk for a prolonged period, established appellees' specific intent to kill. See Daniels and Pelzer, 963 A.2d at 428 ("To suggest that the victim's death was the result of an 'accidental act' or was the result of something less than intentional conduct because he may have died of asphyxiation – caused by appellees – rather than by strangulation or gunshot wounds – also inflicted by appellees – fails to acknowledge that appellees controlled the circumstances surrounding his death every step of the way and that those circumstances fully supported a finding of an intent to kill beyond a reasonable doubt.").

Appellees next attempt to relitigate the initial PCRA appeals, collaterally attacking this Court's decision. They argue that the Court's reasoning was flawed because the Commonwealth's theory at trial was that the gunshots caused the victim's death; thus, they believe, a verdict of first-degree murder was only possible by way of a finding that the victim was killed by the multiple gunshots. Appellees note that the trial court declined to instruct the jury on a cause of death other than the shooting, such as strangulation or suffocation. Appellees then contend that this Court's explication of

what the jury might have found if a different theory had been pursued -- in discussing Strickland prejudice on the first collateral appeals -- violated their Sixth Amendment right to a jury trial. A Strickland prejudice analysis, according to appellees, is constrained by a requirement to contemplate only the trial that actually occurred and cannot proceed on a "speculative" theory of the case not actually pursued by the Commonwealth. See Brief of Appellee Daniels at 33-35, discussing Smith v. Cain, 132 S.Ct. 627 (2012); Chiarella v. U.S., 445 U.S. 222 (1980); and Commonwealth v. Johnson, 966 A.2d 523 (Pa. 2009).

The Commonwealth responds that the witnesses's statements about hearing gunshots were not favorable to appellees in a Brady sense and appellees cannot establish that they were prejudiced. The Commonwealth argues that the evidence at best merely corroborated the Commonwealth's allegation that appellees shot the victim. The Commonwealth notes that this aural evidence certainly does not address whether the victim died at appellees' hands prior to arriving at the park, which is the point relevant to appellees' contention. The Commonwealth also avers that appellees did not establish that the evidence was withheld, since Pelzer's trial counsel's testimony on the point was equivocal at best. Finally, the Commonwealth argues that any prejudice argument is foreclosed by the Court's 2009 decision denying relief on the cause of death claim, which is the theory this evidence was relevant to.

The Commonwealth then argues that the remaining two Brady claims -- respecting the body receiving record and the forensic report -- are waived because they were not raised until after this Court remanded the appeals for the PCRA court to address already existing claims. Alternatively, the Commonwealth contends that the issues are baseless. The Commonwealth argues that the body receiving report is irrelevant because this Court previously concluded that the timing of the victim's demise

was immaterial to specific intent. The Commonwealth then argues that the forensic report (showing no blood) only related to the passenger compartment of the vehicle and did not test items in the trunk. For all of these reasons, the Commonwealth concludes that appellees' Brady claims fail.

In further responses, appellees largely reiterate points already made, but two points bear further mention. First, regarding the witnesses' statements concerning hearing gunshots, appellees say the evidence was exculpatory because it was relevant to whether the victim was alive when appellees shot him. Second, and related to the question of waiver, appellee Daniels contends that the forensic report was attached to his 2000 amended PCRA petition, and further argues that the claim respecting the body receiving record was part of his "existing" Brady claim. Reply Brief of Appellee Daniels at 9.

The PCRA court found that the Brady issue deriving from the body receiving record in fact was not raised in the initial or supplemental PCRA petitions. The PCRA court added that the Brady claims were without merit because the issues related to the manner of the victim's death, and arguments relating to the manner of death, were previously addressed and rejected by this Court on the first collateral appeals.

To succeed on a Brady claim, the defendant must show that: (1) evidence was suppressed by the prosecution; (2) the evidence, whether exculpatory or impeaching, was favorable to the defendant; and (3) prejudice resulted. A Brady violation exists only where the suppressed evidence is material to guilt or punishment, *i.e.*, where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. Commonwealth v. Tedford, 960 A.2d 1, 30 (Pa. 2008).

Taking the witnesses' statements concerning gunshots first, we agree with the Commonwealth that appellees have not demonstrated materiality, or even that the statements were favorable to them. The Commonwealth's theory at trial was that the victim was shot by appellees after being bound and gagged and confined in the trunk of the car, which was a fact that appellees admitted either on the stand (appellee Daniels) or in their statements to police. The alleged Brady evidence does not undermine the Commonwealth's position that the victim was killed by gunshots. Additionally, appellees' Brady claim depends upon accepting the notion that trial counsel was constitutionally obliged to pursue the theory that the victim was dead at the time appellees shot him. That Strickland argument was raised and rejected, on prejudice grounds, on the initial PCRA appeals. Daniels and Pelzer, 963 A.2d at 428. We will not reconsider that issue, which is an indispensable predicate to the current Brady claim related to the witnesses' statements.

Second, the PCRA court correctly determined that the Brady claim related to the body receiving record was waived, as it was not raised prior to the remand. This Court explicitly limited the subject matter of the remand to the remaining issues already raised by appellees; we neither invited nor authorized appellees to raise additional collateral claims years after expiration of the PCRA time-bar. Daniels and Pelzer, 963 A.2d at 435. Thus, this new claim is waived. See Commonwealth v. Porter, 35 A.3d 4, 12 (Pa. 2012) (appellant cannot add Brady claim to existing PCRA petition without PCRA court's permission); Commonwealth v. Ali, 10 A.3d 282, 320 (Pa. 2010) (Supreme Court PCRA remand for specific purpose is not authorization to raise new collateral claims).

However, the Commonwealth is incorrect that the Brady issue related to the forensic report was not raised prior to the remand. See Supplemental Motion for Post-Conviction Collateral Relief, 12/22/00, at 6-10. The claim nonetheless fails for the same

reason as the claim related to the witnesses's statements: the materiality of the report depends upon the claim – pursued as an ineffectiveness claim on the initial collateral appeals -- that counsel were obliged to argue that the victim was dead at the time appellees shot him. That predicate theory was rejected by this Court, on grounds that appellees failed to show Strickland prejudice. Further evidence supporting the same theory does not alter the Strickland prejudice assessment.

Finally, we address Daniels's attack upon the Court's assessment of Strickland prejudice on the prior appeal, on grounds that the Court supposedly cannot discuss other theories not directly presented to the trial jury. This objection was a matter for reconsideration or reargument after our prior decision, and is not an available issue on this appeal, involving distinct claims. In any event, because versions of this sub-argument are raised by Daniels respecting multiple issues, we will explain why we disagree with the notion that the Strickland prejudice assessment is so narrow. Strickland requires that claims of counsel ineffectiveness be approached with a strong presumption that counsel was effective, and the Strickland prejudice assessment requires a court to make judgments – essentially predictions -- about the reasonable probabilities of what the fact finder would have decided if a particular course had or had not been pursued by trial counsel, *i.e.*, if the case had been tried **differently**. Under Strickland, the defendant has the burden to show a reasonable probability that the **outcome** of the proceeding would have been more favorable to the defense – here, respecting the guilt phase -- that Daniels would have been convicted of something less than first-degree murder. Such a determination necessarily requires an assessment of the trial evidence as a whole, measured along with what is proffered on collateral attack.

This Court often engages in such Strickland assessments as part of our jurisprudential review. In doing so, we appreciate that the task is not to identify various

hindsight "gotcha" scenarios: *i.e.,* counsel could have done this, or he should not have done that. Indeed, the U.S. Supreme Court has emphasized that the Sixth Amendment right to counsel does not exist in a vacuum, but exists to ensure a fair trial, a trial whose result is reliable. Lockhart v. Fretwell, 506 U.S. 364, 368-69 (1993); Strickland, 466 U.S. at 684; see also U.S. v. Cronic, 466 U.S. 648, 658 (1984) ("[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."). The fact that the defendant on collateral attack looks at a fixed record and produces a theory by which trial counsel can be assailed for failing to parry a point made by the Commonwealth does not mean that the Commonwealth would have been left without recourse, under the available evidence. Our examination on the prior appeals reviewed the totality of the trial evidence produced respecting appellees' manifested intention to kill, and properly assessed that evidence in determining whether there was a reasonable probability that appellees' new, collateral theory -- a theory itself subject to Commonwealth response and rebuttal, it is important to remember -- if pursued, would have led to a different verdict. Given appellees' extended course of conduct reflected in the trial record here, we concluded, the course proposed by appellees on collateral attack not taken by counsel did not offer a reasonable probability of a result other than a verdict of first-degree murder. The fairness of the proceeding focus required under Strickland works two ways; and final judgments are not upset by courts employing artificially blinkered views of the fairness of the initial trial.

For the foregoing reasons, appellees' Brady claims do not entitle either to relief.

B.

In another claim relating to their core complaint that their trial counsel were ineffective for failing to better dispute the cause of death, appellees next raise a layered ineffectiveness claim deriving from counsels' failure to object to the court's guilt phase jury instructions. Appellees say that those instructions fostered an unbalanced presentation of the specific intent issue and encouraged the jury to presume they had an intent to kill from their act of shooting the victim. Related to this claim, appellees separately aver that trial counsel were ineffective for failing to request a mistake of fact jury instruction.

Thus, Pelzer complains that the trial court focused the jury's attention on the fact that the victim had been shot without also directing the jury that it had to believe that the victim was alive at the time he was shot in order to find a specific intent to kill. Pelzer contends that the jury should have been told that a reasonable mistake of fact could refute the inference arising from the use of a deadly weapon on a vital part of the victim's body. Pelzer adds that the trial court did not make any reference to the evidence of strangulation as a possible cause of death or reference the defense claim that the victim was already dead at the time he was shot. Pelzer continues that trial counsel should have objected to these "unbalanced" instructions which, he says, failed to present the defense to the jury. He also contends that he was prejudiced because the cause of death was in question, as there was at least some evidence that appellees believed the victim was dead before they shot him to make sure.

Pelzer then argues that trial counsel should have requested a mistake of fact instruction, *i.e.,* an instruction that a mistake of fact exists if the defendant had a reasonable and bona fide belief that the victim was already dead when he shot him, and that such a mistake may negate the inference of an intent to kill. Pelzer says there was

sufficient evidence to require such an instruction, citing his statement to the police as proof that he believed the victim was dead prior to the shooting. Brief of Appellee Pelzer at 59, citing 18 Pa.C.S. §304 (defense of ignorance or mistake of fact). Pelzer says that counsel's failure was prejudicial because the cause of death was in question. See Initial Brief of Appellee Pelzer, at 61.

Daniels makes essentially the same argument. According to Daniels, the trial court's instructions shifted the burden to appellees by focusing the jury's attention on the fact that the victim had been shot, suggesting that the shooting was the cause of death, which made Daniels's testimony (that he believed the victim was dead at the time he was shot) appear immaterial. Daniels then contends that trial counsel's decision to join in objections raised by Pelzer's counsel was inadequate. He adds that appellate counsel was ineffective for failing to raise the issue on direct appeal.

Daniels also contends that a defendant is entitled to an instruction on any recognized defense, so long as it is supported by the record. According to Daniels, there was sufficient evidence to require a mistake of fact instruction, on grounds that he lacked the intent to kill because the victim was dead before being shot and he did not personally pull the trigger. Again seeking to collaterally attack our decision in the prior PCRA appeals, Daniels reiterates his view that this Court erred in determining that appellees' intent to kill was demonstrated throughout the course of the kidnapping. Daniels claims that that issue is reserved for the jury to make findings based on the trial that actually occurred. Like Pelzer, Daniels argues that he was prejudiced because a mistake of fact instruction would have advanced his prospects of avoiding a first-degree murder verdict.

The Commonwealth responds that the evidence did not support a mistake of fact defense and, in any event, the absence of the instruction did not prejudice appellees.

First, the Commonwealth notes that a mistake of fact defense is only available when there is proof that the defendant harbored a bona fide and reasonable belief in a fact that negates the intent to commit the crime. The Commonwealth notes that in this case, Daniels's testimony showed that appellees were unsure whether the victim was dead and that he was shot in order to make certain he was dead. Thus, the evidence did not show that appellees had a bona fide belief that the victim was dead at the time of the shooting. Additionally, even if they had such a belief, the Commonwealth asserts that the evidence overwhelmingly demonstrated appellees' specific intent to kill the victim long before they shot him. Thus, according to the Commonwealth, appellees cannot establish an entitlement to relief.

Second, the Commonwealth argues that appellees cannot establish that they were prejudiced by counsels' failure to request the charge. Given the evidence presented at trial, the Commonwealth argues, the jury could not rationally have concluded that appellees lacked the specific intent to kill even if the jury believed both that the victim in fact was dead at the time he was shot, and that appellees believed he was dead. The Commonwealth points to this Court's opinion on the prior appeals to buttress its prejudice argument.

In reply, Pelzer argues that his statement to the police showed that he believed the victim was dead when he was shot. Additionally, echoing Daniels, Pelzer says that the Commonwealth's prejudice argument misses the mark because the trial court's instructions denied the jury the option to consider whether he was guilty of first-degree murder if the killing was accomplished by some means other than shooting.

Daniels responds that the Commonwealth confuses the quantum of evidence necessary to be entitled to an instruction with the quantum necessary to prevail on a

mistake of fact defense. According to Daniels, the Commonwealth cannot speculate regarding what the jury would have ultimately decided.

Similar to its assessment of the Brady claim, the PCRA court concluded that this issue was effectively previously litigated on the prior collateral appeals, since this Court concluded that appellees did not establish that they were prejudiced by counsels' failures in disputing the manner of death.

Preliminarily, we note that Daniels reprises his argument that we are precluded from "speculating" regarding what the jury would ultimately have decided if counsel had pursued a different course. We have already addressed that erroneous notion in disposing of claim A, supra, both in terms of prior litigation on the earlier appeals, and in terms of a proper appreciation of the prejudice assessment under Strickland by a reviewing court.

Turning to the merits, it is notable that neither appellee adequately accounts for the objections actually raised by trial counsel, or this Court's discussion of a similar issue on direct appeal. In point of fact, Pelzer's counsel objected to the trial court's instruction to the jury that the only cause of death was the gunshots and that the specific intent to kill could be inferred from the use of a deadly weapon upon a vital part of the body. N.T., 11/9/89, at 58-61. Daniels's counsel joined in the lengthy objection. Id. at 61. Counsel for both appellees also specifically asked that the court's charge on cause of death address the possibility that death was caused by strangulation; and appellees further objected that the court's charge reflected the trial court's theory of what had happened, notwithstanding that evidence supporting alternative theories of death had been presented to the jury, which should also be accounted for in the court's charge. The trial court repeatedly denied the objections, emphasizing that the evidence respecting strangulation would only "show more" respecting appellees' intent. Id. at 60.

On direct appeal, appellee Pelzer argued that the trial court improperly expressed its opinion to the jury that the victim died of gunshot wounds thereby compromising the fact-finding function of the jury. The Court rejected the claim on the basis that the trial court's instructions comported with the evidence. We specifically held that the charge did not undermine appellees' defense, which was that malice was lacking because they believed the victim to be dead at the time he was shot. See Commonwealth v. Pelzer, 612 A.2d at 413. Appellees now present a similar underlying claim, with a Sixth Amendment gloss sounding in trial counsel ineffectiveness, but without fully accounting for counsel's actual conduct or the claim raised on direct appeal. Although the Sixth Amendment framing may prevent the claim from being rejected outright on previous litigation grounds, see Commonwealth v. Collins, 888 A.2d 564, 571 (Pa. 2005), the fact that prior counsel pursued closely related arguments, only to have them fail, obviously undermines appellees' present Sixth Amendment claims. Notably, appellees do not adequately address the actual objection forwarded by Pelzer's counsel, which was joined by Daniels's counsel, nor do they even acknowledge, much less address, this Court's discussion of the related issue counsel then raised on direct appeal. Because appellees fail to account for the actual trial (and direct appeal) actions by prior counsel, their current collateral attack is a non-starter.

Finally, we ultimately agree with the PCRA court that the resolution of this issue is controlled by our prior decision on the initial PCRA appeals, where we noted that the specific cause of the victim's death said "little about appellees' intention -- which was a very different question." Pelzer and Daniels, 963 A.2d at 428. There was ample evidence from multiple sources supporting appellees' demonstrated intent to kill their victim. In light of the trial evidence concerning the circumstances leading to the victim's death at the hands of appellees -- and the actual objections by prior counsel --

appellees simply have not shown a reasonable probability that the jury's decision regarding specific intent would have been altered if only trial counsel had made more vociferous or specific objections or requested a mistake of fact instruction, assuming one would have been warranted. Accordingly, this trial counsel ineffectiveness issue fails, and the derivative layered claim of appellate counsel ineffectiveness necessarily fails.

C.

Appellees next complain that trial counsels' guilt phase closing arguments were ineffective. Pelzer avers that his lawyer's closing failed to offer a coherent defense, but instead consisted of a discussion of general legal principles, which never focused on the issues presented in a "factually complex" case. Again reprising his theory respecting the cause of death, Pelzer complains that counsel never argued to the jury that he lacked the intent to kill because the victim was already dead when he shot him, that shooting a dead person is not murder, and that no inference of intent to kill can be drawn from the shooting if there was a reasonable doubt whether the victim was already dead when he shot him. Pelzer concludes that counsel's closing was an abdication of responsibility.

Daniels likewise complains that his lawyer's summation failed to lay out a coherent defense and, worse, argued incorrect legal precepts to the jury. Daniels contends that the argument clouded, rather than clarified, the cause of death and specific intent issues for the jury. Like Pelzer, Daniels avers that counsel should have argued that he could not have harbored a specific intent to kill if the victim was already dead when Pelzer shot him. Daniels also notes that standby counsel and Thomas Bello, Esquire (co-defendant Stacey Torrance's counsel) testified at the PCRA hearing that trial counsel (retained by Daniels and granted *pro hac vice* status) was looking to

divine intervention for help instead of arguing the law as relevant to the facts of the case. N.T., 12/12/01, at 29-30 (Attorney Drost); N.T., 5/7/02, at 45-51 (Attorney Bello). Daniels concludes that he was prejudiced because counsel's closing abandoned the only viable defense.

The Commonwealth responds that counsels' performance was more than adequate: they forwarded theories of innocence, attacked the prosecution's evidence, and emphasized the presumption of innocence and the Commonwealth's burden of proof.

In specific response to Pelzer, the Commonwealth argues that counsel emphasized that Pelzer was innocent until proven guilty and that the Commonwealth had the burden of proving guilt. The Commonwealth also notes that counsel in fact argued that the victim was dead before he was shot and that, therefore, Pelzer did not have the specific intent to kill. The Commonwealth adds that counsel argued that Pelzer's inculpatory statements to the police were unreliable and that Daniels's trial testimony implicating Pelzer should be discounted because he was merely trying to shift blame for the crimes to Pelzer. Alternatively, the Commonwealth offers that Daniels cannot establish prejudice, since even if the jury believed the victim was dead at the time he was shot, this fact did not undermine the proof of the specific intent to kill or that appellees directly caused the victim's death.

In response to Daniels, the Commonwealth stresses that counsel argued that appellees never intended to kill the victim and that the conspiracy extended only to stealing his keys and burglarizing his parents' homes. The Commonwealth further highlights that counsel argued that Daniels lacked the specific intent to kill because the victim died before the shooting, and urged the jury to reject Pelzer's statement that he only shot the victim because Daniels held a gun to his head. The Commonwealth

contends that Daniels's counsel cogently discussed several theories of innocence and emphasized his client's credibility (since he had been willing to take the stand in his own defense). Moreover, to the extent that counsel misstated the law regarding reasonable doubt, the Commonwealth argues that any misstatements actually favored Daniels, since counsel exaggerated the Commonwealth's burden of proof. The Commonwealth concludes with the same, alternative argument respecting Strickland prejudice that it forwards with respect to Pelzer.

Daniels briefly responds to the Commonwealth's arguments by noting that the fact that counsel may have argued some points to the jury that were helpful to him does not render his summation adequate. Daniels acknowledges that his counsel argued that the victim may have been dead when he was shot, but according to Daniels, this argument was undermined by a concession that the victim may have been alive.

The PCRA court very briefly stated that the issues of appellees' specific intent and the manner of the victim's death were previously litigated and dismissed. Moreover, the court indicated that the reasonable doubt instruction issued by the trial court was correct. Accordingly, the court determined that this ineffectiveness issue failed.

In Commonwealth v. Bryant, 855 A.2d 726 (Pa. 2004), the Court summarized the deference required in reviewing an attorney's summation as follows:

> The right to effective assistance extends to closing arguments. Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. Judicial review of a defense attorney's summation is therefore highly deferential.

Id. at 742 (quoting Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003)). Additionally, the Bryant Court stressed that review must be based on the entirety of the summation and not mere snippets or arguments taken out of context. Id. at 743.

Mindful of the appropriate review standard -- and mindful of the realities of trying this case where identity was not at issue, and where appellees held a teenager bound and gagged in the trunk of a car for an extended time, while committing derivative crimes of opportunity -- we find that appellees' Strickland claim fails. To be sure, neither attorney's summation was the height of advocacy -- or clarity -- and both summations certainly could have better focused the jury's attention on the defense relating to the cause of death. Nevertheless, viewed in their entirety, the summations reminded the jury of the Commonwealth's burden and the presumption of innocence, argued weaknesses in the Commonwealth's evidence, and forwarded the primary defense theory, comparatively weak though the defense was.

Thus, Pelzer's counsel first reviewed the law guiding the jury's deliberations, emphasizing the presumption of innocence and the nature of reasonable doubt. Counsel then sought to blunt the harmful effect of Pelzer's statement to the police, arguing that it was unreliable because of the circumstances surrounding the interview. He also addressed Daniels's damaging trial testimony that attempted to shift the blame for the shooting to Pelzer and to distance himself from any conspiracy to kill the victim, and asked the jury to compare Pelzer's statement against Daniels's trial testimony. Counsel then asked the jury to consider Daniels's prior history and the physical evidence that was found in Daniels's possession, and then reject Daniels's trial testimony. N.T., 11/8/89, at 41-44, 45, 46-50, 50-52.

Following Pelzer's counsel, Daniels's counsel reminded the jurors of the important function they served as judges of the facts. He emphasized that the alleged

conspiracy was not well organized and was based on a "loosely arranged" agreement. His main contention – logical in light of the evidence that Pelzer fired the shots the Commonwealth argued were fatal -- was that the conspiracy extended only to the robbery and burglary, but never included a murder.  Additionally, counsel argued that Daniels withdrew from the conspiracy prior to the shooting, a theory that was based on Daniels's own trial testimony.  Counsel then specifically argued that if the victim was dead at the time he was shot, *i.e.*, "if you find from the facts that the deceased was dead before they took him…," then there was no premeditation because "[y]ou can't have premeditation when a person is already dead."  Counsel continued by offering an alternative theory, which assumed that the victim was alive (consistent with the Commonwealth's expert's opinion), arguing that Daniels's participation in the conspiracy ended prior to the shooting.  Counsel also urged the jury to consider that his client was the only defendant to take the stand, asserting that his testimony should therefore be given weight.  Counsel argued that Daniels's police statement, which did not comport with Daniels's trial testimony that the conspirators knew the victim was dead by the time of the shooting and that he never conspired to kill the victim, was unreliable based on the circumstances surrounding the police interview.

Counsel then turned to the concepts of the presumption of innocence and reasonable doubt.  Related to reasonable doubt, counsel confusingly stated that "there is no reason, reasonable reason that we can assign that he's innocent or that this fact may not be so."  In a rhetorical flourish, counsel then stated that he had coined the term "assumption of innocence" rather than "presumption of innocence," explaining to the jury that he "preferred" that term.  Counsel later addressed the concept of reasonable doubt in a similarly idiosyncratic fashion, explaining that,

> I mean you have a whole avalanche of evidence [from the Commonwealth].  But what [reasonable doubt] is, you have to look on the

other side and say okay … there is evidence that this has transpired but over here is a candle that says look at me, can you dismiss me, can you dismiss me. As long as you cannot blow out the candle by a reasonable doubt, then the law says you have to find for the Defendant…. That's been our principle of law since man remembers to the contrary. Man doesn't remember to the contrary. That's why when a person says they have a criminal record or that they have been found guilty of something, it carries such a stigma, that is because a jury of your peers has found that there was no evidence of your innocence.

You see, they didn't find that they believed that you were innocent or they believed that they were guilty, that's not the test. That's not the test. The test is that the Jury has deliberated and they find that there is no fact, reasonable fact establishing your innocence. That's an entirely different situation, not finding a reasonable fact to establish an innocence than to say we feel that you're guilty. You say this is done, this is not a test. We didn't bring you hear [sic] to determine how you feel or what, you know, your basic assumptions or what your basic notions are. Your role is to determine the facts based on that standard of reasonable doubt.

Id. at 95, 98, 99-100, 103, 108, 110.

It was no easy task for either defense lawyer in this case given appellees' extended detention of the teenaged victim in horrifically confined circumstances, and the task no doubt was particularly difficult for Pelzer's counsel because of the evidence that his client had delivered the four-shot *coup de grace*. (The point is that even if the jury were to believe that the victim was already dead, at appellees' hands, the act of shooting made the road that much harder for counsel.) The main thrust of Pelzer's counsel's argument was aimed at blunting the two most damning sources of evidence against his client: Pelzer's own incriminating statement to police and Daniels's trial testimony, in which Daniels' claimed, for first time, that he intended to let the victim go. Counsel argued that Pelzer's police statement was not reliable and that Daniels should not be believed. Counsel also touched upon the issue related to the cause of death. These were among the very few arguments to be made given the facts and circumstances surrounding the crime and Daniels's trial decisions.

Daniels's counsel stressed those aspects of the case distinguishing his client from Pelzer in a fashion that might warrant a lesser verdict, in particular the slant that could be derived from the fact that he was not the shooter. In addition, counsel argued that his client had withdrawn from the conspiracy, and he directly addressed the cause of death and specific intent issue. While counsel then gave an alternative argument, premised upon assuming that the victim was alive at the time he was shot, alternative arguments do not necessarily undermine the defense case; it is the Commonwealth that bears the burden. Thus, counsel frankly addressed the most damning evidence against his client, albeit he did so in an idiosyncratic fashion. Finally, although counsel's description of the reasonable doubt standard did not comport with the governing law, the Commonwealth accurately observes that the argument – not objected to by the Commonwealth – would have heightened the Commonwealth's burden. It is difficult to see how this particular misstatement, under the circumstances, rendered counsel constitutionally ineffective.

We do not suggest that either closing argument was a paragon of clarity. But, considering the purpose and potential effect of summation – which remains merely argument – neither are we prepared to hold that the presentations here were so lacking as be constitutionally deficient under Strickland. Moreover, to the extent the arguments by either or both lawyers can be deemed deficient, we are satisfied that appellees have not proven Strickland prejudice. Again, a central part of appellees' argument turns on the pervasive complaint that counsel did not more aggressively or directly pursue a cause of death-based defense. We have already addressed the considerations weighing against the notion that that course offered a reasonable probability of a better outcome, given the damning evidence counsel had to contend with and could not explain away.

Accordingly, we hold that appellees' claims respecting their lawyers' guilt phase closing arguments fail. The layered claims related to appellate counsel ineffectiveness necessarily fail as well.

D.

Co-defendants Stacy Torrance and Eugene McClure were tried together with appellees. Each of the four defendants had made a statement to the police and each statement was redacted and then admitted at trial, over objection, but only against the defendant making the statement, pursuant to Bruton v. U. S., 391 U.S. 123 (1968). Appellees now allege that the trial court erroneously admitted the statements and appellate counsel were ineffective for failing to pursue a claim of trial court error under Bruton on direct appeal.

Pelzer contends that the statements were "interlocking," that the admission of the statements violated his constitutional rights to confrontation and due process under Bruton, and that the trial court's instructions did not cure the error. Moreover, according to Pelzer, redaction alone does not avoid the reach of Bruton when the redacted statement is powerfully incriminating. Additionally, Pelzer argues that the redactions were insufficient because the jury could infer to whom the statements referred in light of their interlocking nature. Pelzer declares that "there are also numerous specific ways in which the statements interlock…," Brief of Appellee Pelzer, at 70, but he fails to identify any of these alleged "specific ways."

Daniels also emphasizes the interlocking nature of the statements. Daniels argues that the redactions were inadequate and alerted the jury to the fact that names were removed, making the redactions especially suspect. Brief of Appellee Daniels, at 42-43 (citing U.S. v. Tutino, 883 F.2d 1125 (2d Cir. 1989) and U.S. v. Long, 900 F.2d

1270 (8th Cir. 1990)). Like Pelzer, Daniels contends that the statements were "powerfully incriminating" and lent substantial weight to the prosecution's case in violation of Bruton. Daniels then goes the next step and specifically summarizes the statements to demonstrate how he believes they incriminated him. Finally, Daniels alleges that appellate counsel was ineffective for failing to raise the preserved Bruton issue on direct appeal.

The Commonwealth responds that in order to violate Bruton, the non-testifying co-defendant's statement must be incriminating on its face without linkage to other evidence. Where the statement is redacted and the jury is properly instructed, the Commonwealth contends, no Bruton violation occurs. The Commonwealth then notes that no Bruton violation could have occurred with regard to the admission of Daniels's statement since he testified at trial. Separately, the Commonwealth argues that the remaining statements were all properly redacted with neutral terms such as "the other guy" or "him" substituted for the actual names of the various co-defendants. Additionally, the Commonwealth avers that the trial court properly instructed the jury that each statement could only be used against the defendant who made it.

Pelzer responds that the Commonwealth's argument fails to address the interlocking nature of the statements under Cruz v. New York, 481 U.S. 186 (1987). Pelzer also cites Vazquez v. Wilson, 550 F.3d 270 (3d Cir. 2008), for the proposition that contextual implication can violate a defendant's rights under the Confrontation Clause.

The PCRA court concluded that the statements were all properly redacted by replacing references to the co-defendants' names with neutral pronouns, such as "he," "him," or "the other guy." The PCRA court also detailed the trial court's instruction, concluding that the trial court properly instructed the jury.

Under governing precedent, the underlying <u>Bruton</u> claim is without merit, and thus the collateral claim focusing upon appellate counsel lacks merit. We need not engage the parties' reliance upon decisional law from other jurisdictions, including the Third Circuit U.S. Court of Appeals, because those cases do not control, <u>see</u>, <u>e.g.</u>, <u>Stone Crushed Partnership v. Kassab Archbold Jackson & O'Brien</u>, 908 A.2d 875, 884 (Pa. 2006), and there is ample decisional case law from this Court following and applying <u>Bruton</u>.

The general rule in a joint trial of co-defendants is that the law presumes that the jury can follow an appropriate instruction, which explains that evidence introduced with respect to only one defendant cannot be considered against other defendants. <u>Bruton</u> departed from this salutary general rule only by concluding that where there are "powerfully incriminating statements" admitted against a non-testifying co-defendant who stands side by side with the accused, such statements can be devastating as well as inherently suspect when they shift the blame to the accused. <u>Commonwealth v. McCrae</u>, 832 A.2d 1026, 1037 (Pa. 2003). Following <u>Bruton</u>, the U.S. Supreme Court has approved redaction and a limiting instruction as a means of eliminating the possible spillover prejudice arising from the admission of a non-testifying co-defendant's confession against that co-defendant at a joint trial. <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987). <u>Bruton</u> and its progeny establish Sixth Amendment norms governing state criminal trials, and this Court has had ample opportunity to consider and apply the precepts. In our own implementation of this federal law, we have explained that the challenged co-defendant's statement must be incriminating on its face and that redactions involving the substitution of neutral pronouns (such as those used here) instead of names or other obvious methods of deletion, do not obviously identify the other co-defendants. <u>Commonwealth v. Roney</u>, 79 A.3d 595, 624 (Pa. 2013).

Applying these settled principles, appellate counsel cannot be deemed ineffective for failing to pursue the Bruton claim on appeal. The co-defendants' statements here were redacted by using neutral pronouns, blunting the concern that they could be deemed incriminating (as to the other co-defendants) on their face. Indeed, appellees point to no specific redaction that reflects an obvious method of deletion that would have invited the jury to substitute one or another co-defendant's name. Additionally, the trial court gave an appropriate limiting instruction at the time the statements were admitted, and again at the conclusion of trial, directing the jury that "a statement made before trial may be considered only as evidence against the one who made the statement." N.T., 11/9/89, at 24. Appellees' current arguments largely ignore the specifics of the redactions. The Cruz case that Pelzer cites stands for the proposition that **unredacted** interlocking confessions cannot be presumed to be admissible. That did not happen here. The U.S. Supreme Court and this Court have specifically approved of the method of redaction employed by the trial court here, and appellees have not mounted any persuasive argument that shows that, if only appellate counsel had pursued the issue, there was any prospect of success under existing law. See Roney, 79 A.3d at 624. Counsel on appeal are not obliged to pursue claims that lack a reasonable prospect of success. Accordingly, appellees' claim of appellate counsel ineffectiveness fails.

E.

Finally, Daniels raises two guilt phase claims not raised by Pelzer. First, Daniels alleges that the trial court's reasonable doubt instruction employing the language "restrain" was in error and trial counsel was ineffective for failing to object to the charge. Daniels focuses upon the trial court instructing the jury that "[a] reasonable doubt is a doubt that would cause a reasonably careful and sensible person to restrain before

acting upon a matter of importance in his own affairs." N.T., 11/9/89, at 14-15. The Commonwealth responds that the trial court has broad discretion in phrasing jury instructions and that this Court has rejected the very same challenge in many prior cases. The PCRA court's reasoning follows the precedent-based argument forwarded by the Commonwealth.

While the more commonly used instruction respecting reasonable doubt employs the term "hesitate" rather than "restrain," this Court has repeatedly rejected the argument Daniels forwards, finding the distinction between the two terms to be *de minimis*. See Commonwealth v. Simpson, 66 A.3d 253, 274-75 (Pa. 2013) (collecting cases); Commonwealth v. Collins, 957 A.2d 237, 264 (Pa. 2008) (collecting cases). Trial counsel was not ineffective for failing to raise a claim repeatedly rejected; the layered claim of appellate counsel ineffectiveness necessarily fails.

Second, Daniels raises a layered claim of ineffectiveness arising from the trial court's use of the court crier to communicate instructions to the jury outside of his presence. Daniels avers that the trial court told the crier to relay instructions to avoid the press and to avoid discussions of the case with outside parties. He then claims that this unobjected-to process violated his due process right to be present and his right to a fair and impartial jury. The Commonwealth responds that any statements by the court crier were fleeting, were entirely consistent with the law governing jury deliberations, and that Daniels cannot establish prejudice from any of these interactions.

The PCRA court concluded that the statements were communicated to the crier in the presence of all counsel. Furthermore, the PCRA court noted that the instructions did not involve legal matters, but were administrative in nature. Accordingly, the court concluded that the claim lacked merit.

As a claim sounding in ineffectiveness, this issue is frivolous. Two of the three interactions referenced by Daniels involved instances when the jury was discharged for the day. In the first instance, the court told the crier to let the jury go home and "tell them I caution them not to discuss the case." N.T., 11/3/89 at 182. The second instance occurred when the judge released the jury for the weekend, instructing the court crier to inform the jury that they could go home and that "they [were] not to read any articles in the newspaper about this case or anything dealing with this case." N.T., 11/10/89, at 79. The third instance occurred after the jury asked to be reinstructed on accomplice liability and murder. The court told the crier to tell the jury to "save [the request] for tomorrow morning." N.T., 11/9/89, at 123.

The notion that the outcome of the trial would have been different if only trial counsel had objected to the above three administrative directives is ludicrous. Lawyers are not constitutionally obliged to be obstreperous or to make objections just to make them. Pennsylvania law generally requires a showing that *ex parte* communications with a jury resulted in prejudice in order to warrant relief. See Commonwealth v. Ali, 10 A.3d 282, 313 (Pa. 2010) ("Nothing in the truncated explanation of the court crier, or in appellant's proffer, suggests that the court crier's communication with the jury, concerning the mere logistics of recording the verdict on the slip, affected the court's charge or the actual deliberative process of the jury" and appellant could not establish actual prejudice); Commonwealth v. Bradley, 459 A.2d 733, 739 (Pa. 1983).

Daniels has not established that the substance of the crier's communications with the jury was anything other than what the court directed in open court in the presence of the parties. The crier's communications were administrative in nature and did not touch upon substantive matters. Moreover, the directive regarding discussions of the case when the jurors were sent home were consistent with the law governing jury

deliberations, and mere reminders of directives the judge issued to the jury in open court at other times. This layered claim is frivolous.

## IV. PENALTY PHASE ISSUES

Having concluded that appellees raise no guilt phase issues warranting relief, we now turn to the penalty phase. The PCRA court granted appellees penalty phase relief with regard to their claims that trial counsel were ineffective for failing to investigate and present evidence in mitigation. We address this issue first.

A.

It is well-settled that "judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. Few tenets are more settled than the strong presumption that counsel is effective. Id. at 690; Burt, ___ U.S. at ___ , 134 S.Ct. at 17. "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." Commonwealth v. Puksar, 951 A.2d 267, 277 (Pa. 2008) (quoting Commonwealth v. Miller, 819 A.2d 504, 517 (Pa. 2002)).

Specifically respecting stewardship in a capital case, it is well-settled under the Sixth Amendment that counsel has an obligation to conduct a reasonably thorough investigation for mitigation evidence or to make reasonable decisions that make further investigation unnecessary. E.g. Commonwealth v. Sattazahn, 952 A.2d 640, 655 (Pa. 2008); Strickland, 466 U.S. at 691-92. In evaluating a claim of constitutional deficiency in investigating and presenting mitigation evidence, we consider a number of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented at trial, the additional or different mitigation evidence that the

PCRA petitioner proves could have been presented, and the countervailing strength of the Commonwealth's evidence in aggravation, including rebuttal of the new defense evidence. None of these factors is, by itself, dispositive, because even if the investigation conducted by counsel was unreasonable, this fact alone will not require a grant of relief if the defendant cannot demonstrate Strickland prejudice. Commonwealth v. Lesko, 15 A.3d 345, 380 (Pa. 2011).

The Strickland test for prejudice requires a showing of a reasonable probability that the outcome of the penalty proceeding – here, the unanimous verdict of death -- would have been different. Obviously, a penalty verdict only sufficiently supported by the record is more likely to have been affected by a deficiency in counsel than one with overwhelming record support. Ultimately, a reviewing court must ask whether "the result of the particular proceeding [was] unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Lesko,15 A.3d at 383. In this case, as the jury found four aggravating circumstances and two mitigating circumstances related to each appellee, the prejudice inquiry considers whether there is a reasonable probability that, had the PCRA evidence been adduced at the penalty phase at least one juror would have concluded that the mitigating circumstances collectively outweighed the aggravating ones. Commonwealth v. Gibson, 19 A.3d 512, 526 (Pa. 2011) ("Gibson II").

The PCRA court addressed the mitigation evidence issue as to each appellee separately, and properly so because the mitigation evidence presented at trial, and the additional mitigation evidence forwarded at the PCRA level, was particular to each appellee. Related to appellee Pelzer, the court noted that Pelzer's mitigation evidence at trial consisted only of testimony from Pelzer himself and from his aunt, Christine "Perstine" Foy.

Pelzer testified that he did not have a prior criminal record, that he moved in with his father at some point and that he eventually lived with Foy when he was sixteen or seventeen. He listed the number of sports teams he played on in high school, stating that he did not complete high school. He also explained that he participated in, but did not complete, the Reserve Officers' Training Corps ("ROTC") program. Pelzer testified that he began using drugs and alcohol when he was fifteen and that he had been using cocaine and drinking at the time of the crime. N.T., 11/13/89, 25, 28, 30-31.

Foy briefly testified as to Pelzer's background, noting that he was a "slow learner but he was gifted with his hands." She further testified that Pelzer lived with her for "awhile" off and on, and that he was always respectful to her and her family. N.T., 11/13/89, at 46. Ultimately, members of the jury found two mitigating circumstances: (1) the jury unanimously found the no significant criminal history mitigator, 42 Pa.C.S. § 9711(e)(1), and (2) one juror found the catchall mitigator under subsection 9711(e)(8).

Based upon Pelzer's PCRA presentation, the PCRA court found that trial counsel could have presented additional and more pointed evidence from Foy, as well as testimony from Pelzer's uncle, Hilderbrand Pelzer, and his aunt Gloria (Hilderbrand's wife), about Pelzer's childhood circumstances. The court further found that trial counsel could have presented expert testimony in support of two additional mitigating circumstances.

Foy testified at the PCRA hearing, offering what was indeed more pointed testimony of Pelzer's life history. Specifically, Foy claimed that Pelzer's mother was a compulsive gambler, who could not keep a stable place of residence and permitted her home to be taken over by drug dealers. Foy also testified that Pelzer attended five different elementary schools and three different middle schools due to frequent changes

of residence. Foy stated that Pelzer's mother allowed drug dealers to move into the children's bedrooms, forcing the children to sleep on the floor.

Foy also testified that the men in Pelzer's mother's life abused the children. In particular, she testified that one man, Tony Barnes, raped Pelzer's sister and beat Pelzer and his brother with two-by-four pieces of wood. Foy said that she witnessed Barnes hitting Pelzer with an ironing cord until his skin split open and that Barnes would threaten the children "with special little weapons, like metal things tied with knots and nails." Foy claimed that she tried to intervene, but Pelzer's mother was not receptive. Foy stated that she informed trial counsel of Pelzer's childhood circumstances, but she was not asked any questions regarding the information when she testified at the penalty phase.

Gloria and Hilderbrand Pelzer testified at the PCRA hearing that Pelzer was designated as socially/emotionally disturbed in school. Hilderbrand and Gloria stated that they would have testified at the penalty phase hearing had they been asked.

Pelzer also presented expert testimony from two psychologists with Ph.D.s, Dr. Harry Krop and Dr. Barry Crown, at the PCRA hearing. Dr. Krop testified that school records indicated that Pelzer had a learning disability and that he suffered from "social, emotional problems, impulsivity, depression, insecurity, feelings of inadequacy relative to social situation, and considerable inner tension." Dr. Krop admitted that there was no evidence of a "diagnosable mental disorder," and diagnosed Pelzer as suffering from polysubstance abuse. He further testified to an opinion that the interactive effect of Pelzer's background, his learning disability, and his drug dependence resulted in certain personality characteristics and coping strategies that combined to cause him to have an extreme mental or emotional disturbance at the time of the offense, which is a mitigating circumstance recognized at 42 Pa.C.S. § 9711(e)(2). He then stated an opinion that

those same factors combined to significantly impair Pelzer's ability to appreciate the criminality of his conduct or to conform it to the requirements of the law – adverting to another statutory mitigating circumstance. See 42 Pa.C.S. § 9711(e)(3). Dr. Krop also asserted that Pelzer's school records presented red flags, indicating that psychological testing was warranted. N.T., 12/11/01, at 63-64, 74-75, 80-81, 85.

Dr. Crown testified that Pelzer's IQ test results were in the normal range and that he "matured out of some of these problems with age." Dr. Crown noted that the school records reflected that there was a referral to a child psychiatrist and evidence of depression, feelings of inadequacy and anxiety. Like Dr. Krop, Dr. Crown testified to a "cumulative" effect of circumstances. In his opinion, Pelzer's background of abuse, dysfunction, learning problems, and drug abuse caused Pelzer to suffer from an extreme mental or emotional disturbance at the time of the offense which impaired his capability to appreciate the criminality of his conduct and to conform his actions to the requirements of the law, evidence in support of the same § 9711(e)(2) and (e)(3) mitigators cited by Dr. Krop. N.T. 12/13/01, at 21, 27, 30-31, 41-42.

Mr. Padova, Pelzer's trial counsel, also testified at the PCRA hearing, offering that it would have been his practice to obtain Pelzer's school records, but admitting that he did not have notes indicating that he requested the records and he did not recollect reviewing the records. N.T., 5/10/02, at 47. Padova admitted that he did not retain a mental health expert, but indicated he may have done so if he had the school records. Id. at 49-50. (The PCRA court noted in its opinion that the school records reflected that a psychological examination was performed on Pelzer at age 14 and found him to be socially and emotionally disturbed; he was placed in a special class. The record supports the PCRA court's notation.)

Padova, testifying over twelve years after the trial, did not recall much of his investigation and the interviews that he conducted in preparation for the penalty phase, but he stated that his overall plan was "to present some idea as to Mr. Pelzer's background, people that cared for him, cared about him, where he was from, things of that sort." Id. at 48. Padova had a note that indicated that he "got" the information that he wanted from Perstine Foy's testimony during the penalty phase. Id. at 68. Furthermore, his notes indicated that he had learned that Pelzer was disrespectful and was thrown out of school; he testified that he may have considered painting Pelzer in a positive light for the jury, which is why he may have avoided any discussion of Pelzer's time in school. Id. at 74. (We stress, however, that much of Padova's testimony was vague or speculative; his central claim was that he did not remember; even with regard to Pelzer's school history, Padova stated: "That's the only thing I jotted down. I don't recall whether or not anyone else told me anything.")

The Commonwealth presented rebuttal expert testimony from Dr. John O'Brien (M.D. Psychiatry) and Dr. John Gordon (Ph.D. Psychology). Dr. O'Brien testified that he disagreed with the diagnosis of a mixed personality disorder found in the presentence investigation prepared after the trial. In any event, Dr. O'Brien further stated that a mixed personality disorder does not amount to an extreme mental or emotional disturbance. He agreed that Pelzer suffered from a history of alcohol and mixed substance abuse, but stated that such abuse likewise is not an extreme mental or emotional disturbance. Dr. O'Brien specifically disagreed with Dr. Krop and Dr. Crown's opinions that there was evidence establishing the (e)(2) or (e)(3) mitigator. Dr. O'Brien also did not agree that there was evidence of a learning disability, noting that the school records reflected that Pelzer's intelligence was "normal," and that his problems were "emotional." N.T., 5/9/02, at 30-32, 122-24, 207-09.

Dr. Gordon testified that he did not agree that Pelzer suffered from a learning disability. Instead, like Dr. O'Brien, he testified that Pelzer's school problems "were directly related to his social and emotional difficulties." Thus, Dr. Gordon specifically discounted Pelzer's experts' notion of cumulating factors, which necessarily included a learning disability component. Id. at 222, 234-35.

The PCRA court concluded that there was no reasonable or strategic reason for trial counsel's failure to contact and present testimony from Gloria and Hilderbrand. Furthermore, the court faulted trial counsel for failing to thoroughly question Foy while she was on the stand, noting that her testimony at trial was four pages long as compared to the forty-six pages of testimony at the PCRA hearing. The PCRA court further found that trial counsel failed to adequately review Pelzer's school records, "as a cursory examination would have revealed [his] long-standing psychological issues." Furthermore, according to the court, a reasonable attorney would then have hired a mental health expert given the information in the school records. The court also noted that "the pre-sentence investigation reported that Pelzer had been diagnosed with mixed personality disorder. This was not presented to the jury during the penalty phase."[3] PCRA court Slip Op., 11/22/11, at 33-34. The PCRA court further stressed that Dr. Krop's diagnosis for purposes of the PCRA was consistent with the pre-sentence mental health report, which diagnosed Pelzer as suffering from a "mixed

---

[3] The PCRA court obviously was mistaken to fault counsel for failing to "present" the pre-sentence investigation report to the jury, since the report did not come into existence until after the verdict. The pre-sentence report was prepared by Dennis Martell and was dated December 11, 1989, while the pre-sentence mental health evaluation prepared by Lawrence Byrne, M.Ed., was dated November 20, 1989. Presumably, the PCRA court intended its citation to the pre-sentence report as corroboration that there was something to be found in a mental health diagnosis contemporaneous to the trial, and that the evidence in the school records should have triggered an inquiry by counsel along those lines.

personality disorder, schizoid reactive paranoid and sociopathic features, and a long history of drug abuse." Id. at 32.

The PCRA court did not separately discuss Strickland prejudice for each appellee, summarily concluding instead only that, had the jury known of the troubled lives and psychological issues afflicting each appellee from multiple sources, at least one juror would likely have considered the mitigation evidence to be sufficient to favor a life sentence. The PCRA court further reasoned that this Court's direct appeal opinion was relevant in assessing prejudice, noting that "three Supreme Court Justices did not believe there was sufficient evidence to support the torture aggravating circumstance and the opinion of two Justices who did not believe there was sufficient evidence to support the aggravating circumstance of killing a prosecution witness to prevent his testimony. It is possible that one of the jurors would have given less weight to these aggravators and that the additional mitigation evidence would have convinced them [sic] to find that the mitigators were not outweighed by the aggravators." Id. at 36.

On its present appeal, the Commonwealth argues that trial counsel was effective. The Commonwealth notes that trial counsel spoke with Pelzer about his background, asking him for the names of anyone who could testify on his behalf. The Commonwealth stresses that trial counsel interviewed Pelzer's mother, Foy, Hilderbrand, Pelzer's girlfriend, and a friend named Angel. The Commonwealth notes that Foy was called and testified that Pelzer was a "slow learner." Related to information in the school records, the Commonwealth avers that no one had indicated to counsel that there could be possible mitigation evidence in those records. Instead, the only information that counsel received from Pelzer and his family was that he was disrespectful in school and was expelled. The Commonwealth further contends that this sort of negative information also was incompatible with counsel's penalty phase strategy

of casting Pelzer in a positive light. Thus, the Commonwealth concludes that counsel cannot be faulted for failing to uncover any mental health mitigation evidence, as he never received any information that would cause him to thoroughly investigate the school records and, in any event, the information identified at the PCRA hearing was contrary to his strategy.

Respecting Foy, the Commonwealth stresses that trial counsel asked Foy open-ended questions, which provided an opening for discussing the trauma and abuse Pelzer allegedly suffered as a child. For example, trial counsel asked Foy why Pelzer lived with her as a child; Foy answered that both of his parents were moving. Yet, when asked a similar question during the PCRA hearing, Foy responded differently, claiming that Pelzer moved in with her because of a difficult living situation, and she then elaborated on that difficulty. The Commonwealth avers that Foy simply changed her testimony after Pelzer was sentenced to death, and the differences in her account have nothing to do with the reasonableness of trial counsel's conduct.

The Commonwealth also addresses trial counsel's failure to present at trial the pre-sentence investigation report (despite its non-existence at the time of trial) that diagnosed Pelzer as suffering from a mixed personality disorder. The Commonwealth argues that such a diagnosis is a catch-all and does not constitute an extreme mental or emotional disturbance. Moreover, the Commonwealth notes that its expert disputed that diagnosis.

In any event, according to the Commonwealth, the evidence produced at the PCRA proceeding would not have changed the outcome of the trial, as the evidence may have suggested that abuse occurred, but also would have demonstrated that Pelzer "enjoyed the love and support of numerous concerned adult relatives to help him overcome these obstacles." Brief of Commonwealth at 42. The Commonwealth further

argues that the school records did not shed light on any of Pelzer's problems. The Commonwealth again emphasizes that its own experts did not diagnose Pelzer with any serious mental health issues and did not even find that he had a learning disability. For these reasons, the Commonwealth concludes that Pelzer cannot establish that he was prejudiced by any alleged penalty phase ineffectiveness of counsel.

Pelzer responds that the PCRA court's findings are supported by the record. Specifically, Pelzer contends that counsel conducted a very limited investigation into mitigation evidence, relying on only a narrow set of sources. Pelzer also reiterates his view that counsel failed to adequately and thoroughly question Foy when she was on the stand. Pelzer argues that counsel met with Foy for fifteen minutes prior to her testimony, telling her only that she would be called as a "character witness." Pelzer avers that the mere fact that counsel elicited some testimony from Foy does not change the fact that he could have elicited much more helpful testimony, as demonstrated by her broader testimony at the PCRA proceeding.

Pelzer then turns to his school records and expert testimony, arguing that even a cursory examination of the records would have revealed his longstanding psychological issues. Furthermore, such records, according to Pelzer, would have revealed (1) that he had been placed in classes for social and emotionally disturbed children and (2) his unstable home environment (given his frequent changes of address). Pelzer extends this argument by alleging that the school records would have prompted a reasonably effective attorney to consult with a mental health expert, which, he says, would have led to mitigation evidence of the type he presented during the PCRA hearing.

Pelzer further argues that the lack of a proper investigation prejudiced him as his experts opined that the evidence supported two different statutory mental health-related mitigating circumstances, and also provided additional information relevant to the catch-

all mitigator one juror found. Prejudice is established, he says, given the amount of information that was available, but not discovered, and the dearth of information that was actually presented. Accordingly, Pelzer concludes that the PCRA court's determination that a new penalty phase is warranted should stand.

Having reviewed the testimony presented at the penalty phase, the additional evidence that allegedly could have been discovered and presented, and the parties' arguments, we conclude that the PCRA court did not err in holding that Pelzer established the performance prong of Strickland, *i.e.*, that trial counsel's penalty phase performance in ascertaining and presenting mitigation evidence was deficient.[4] The question might be close if the only alleged deficiency consisted in the failure to call Hilderbrand and Gloria Pelzer and to question Foy more fully concerning various hardships in Pelzer's childhood.[5] But, that unexplained lapse was heightened by counsel's failure to pursue the leads in the school records (assuming counsel even reviewed those records). The records revealed that Pelzer had struggled in school and eventually was placed in classes for socially and emotionally disturbed children when he was fourteen; these facts would have supported and corroborated the family accounts.

---

[4] We stress that the evidentiary hearing was conducted before Judge Lineberger, and not Judge Temin. Judge Temin's opinion makes clear that she did not purport to base her award of a new trial upon credibility determinations, and the Commonwealth does not seriously dispute core factual matters, such as, for example, that the school records were available to counsel and provided some fodder for further investigation. We also note that appellee's evidence was not, and is not, challenged on grounds that his experts were unqualified to render such opinions. And thus, in assessing this evidence for Strickland purposes, we remain mindful that it would have been both (1) admissible and (2) subject to impeachment and contradiction by the Commonwealth.

[5] Trial counsel's notes reflected that he contacted a man by the name of "Mr. Pelzer," who may have been Hilderbrand, while Hilderbrand testified that he did not remember being contacted by counsel. In any event, there was no indication why counsel did not call Hilderbrand at trial (assuming that he was the "Mr. Pelzer" that counsel contacted).

More importantly, this information would have prompted reasonably competent counsel to at least consult with a mental health expert and consider whether further psychological examination was warranted to determine if there was something in his client's background that could have supported a stronger case in mitigation. Notably, the nearly contemporaneous diagnosis found in the pre-sentence report, although it was not nearly so specific or favorable as the PCRA testimony of the experts Pelzer retained for PCRA purposes (who adverted to specific statutory mitigators) offers some measure of corroboration that evidence pertinent to a mitigation presentation sounding in mental health could have been obtained for trial if counsel had pursued the course suggested by the school records.

Again fully mindful that any case in mitigation sounding in the specific (e)(2) and (e)(3) mental health mitigators was subject to rebuttal by the Commonwealth, in assessing counsel's performance, we must also weigh counsel's abject failure to conduct a reasonable investigation against the relative paucity of the case that counsel actually mustered in mitigation. Counsel's presentation was minimal, consisting of testimony from Pelzer himself and brief testimony from Foy. Counsel's failure to present a fuller life history and to consult with a mental health expert and uncover and place before the jury information of Pelzer's childhood circumstances and mental health issues was deficient performance. The failure is noteworthy given that counsel asked the trial court to instruct the jury on the (e)(2) mitigator (*i.e.*, that Pelzer was acting under the influence of an extreme mental or emotional disturbance) by relying on the sole fact that Pelzer allegedly shot the victim under the direction of Daniels. The fact that this theory occurred to counsel should have prompted some measure of supporting investigation. Equally perplexing, in context, is the fact that counsel knew, at a minimum, that Pelzer had been a "slow learner," since Foy testified to that fact at the

penalty phase. Counsel apparently did nothing to investigate and corroborate Foy's description of his client's limitations. Considering the evidence that reasonably competent counsel could have uncovered and offered along with the minimal evidence that counsel actually presented to the jury – and in light of the U.S. Supreme Court's emphasis on the importance of mitigation evidence of this nature, Wiggins v. Smith, 539 U.S. 510, 522-23, 534 (2003); Williams v. Taylor, 529 U.S. 362, 396-98 (2000) -- we conclude that Pelzer has demonstrated that his counsel's penalty phase performance was lacking.

Although the issue is close, and reasonable judicial minds might disagree, we also believe that Pelzer has demonstrated Strickland prejudice. The jury unanimously found four aggravating circumstances: (1) the victim was a prosecution witness to a murder or other felony; (2) the victim was being held for ransom or reward; (3) the offense was committed by means of torture; and (4) Pelzer and his cohorts committed the killing while in the perpetration of a felony. The jury also found, unanimously, the lack of a significant prior criminal history as a mitigating circumstance, and a single juror independently found the catchall mitigator.[6]

Given the relative paucity of the mitigation presentation by counsel at trial, it is significant that jurors were still receptive enough to find two mitigators, one unanimously; and that finding also suggests that the jury did not view the aggravators established by the Commonwealth as being of such a quality – as, for example, in a case of multiple murders – as to make the jury unreceptive to a comparative case in mitigation. Compare Lesko, 15 A.3d at 383-85 (multiple murders case). When analyzing Strickland prejudice in the context of the penalty phase of a capital trial, we

_____

[6] The jury did not specifically enumerate the mitigating factor or factors that this juror considered to comprise the catchall circumstance.

must also keep in mind how tailored death penalty proceedings are toward life sentences, largely under the command of the U.S. Supreme Court, not only in the channeling of aggravators and the differing burdens of proof governing aggravators and mitigators, but also in the fact that a single juror can effectively negate the prospect of a death sentence. See Commonwealth v. Gibson, 951 A.2d 1110, 1149-50 (Pa. 2008) (Castille, C.J., concurring, joined by McCaffery, J.) ("Gibson I"); 42 Pa.C.S. § 9711(c)(1)(iv).

Thus, for purposes of assessing Strickland prejudice, the question is whether the defendant has shown a reasonable probability that, had the mitigation evidence adduced at the PCRA hearing (and rebutted by the Commonwealth) also been presented at the penalty phase, the outcome of the proceedings would have been different because at least one juror would have found that the mitigating circumstances collectively outweighed (or were as weighty as) the aggravating circumstances, or to convince a juror to find that the overall quality of the case in mitigation warranted a sentence of life in prison. See, e.g., Gibson II, 19 A.3d at 526. Parenthetically, we note that the Court has previously held that where the jury has found a mitigating circumstance, including the catchall mitigating circumstance, the defendant cannot demonstrate Strickland prejudice based on additional evidence supporting that same mitigator. Commonwealth v. Rios, 920 A.2d 790, 812-13 (Pa. 2007); Commonwealth v. Marshall, 812 A.2d 539 (Pa. 2002). However, a majority of the Court has recently recognized the difficulty with that proposition, and has concluded instead that the analysis requires a qualitative assessment. See Commonwealth v. Tharp, 2014 WL 4745787 (Pa. September 24, 2014) (Castille, C.J., concurring; Saylor, J., concurring, joined by Todd, J.; Eakin, J., concurring (three concurring opinions, representing views of four members of Court, effectively overruling proposition in Rios and Marshall)).

Tharp followed from cases such as Gibson II and Commonwealth v. Robinson, 82 A.3d 998, 1015-17 (Pa. 2013), which recognized that the weighing process involves an assessment of the relative strength and weakness of the aggravating and mitigating evidence, which is necessarily a qualitative and not a quantitative approach, especially when the catchall mitigator is at issue.

The task of reweighing is not an exact science: we must evaluate the relative strength of the evidence in aggravation and mitigation, as well as the parties' arguments in light of the full hybrid record produced at trial and upon collateral attack. Id. Here, much of the evidence that Pelzer offered on collateral attack, in addition to arguably supporting the mental health mitigating circumstances outlined in Section 9711(e)(2) and (3), would also tend to strengthen the case in support of the (e)(8) catchall mitigator, lending more weight to that mitigator. At the PCRA hearing, Drs. Krop and Crown testified that the information provided to them supported conclusions that Pelzer suffered from an extreme mental or emotional disturbance at the time of the offense which impaired his capability to appreciate the criminality of his conduct (the (e)(2) mitigator), and that he was unable to conform his conduct to the requirements of the law (the (e)(3) mitigator). The experts based their opinions on a combination of factors, including Pelzer's learning disability, his troubled childhood, and his drug and alcohol abuse. To be sure, the Commonwealth presented experts in rebuttal, who testified to their opinions that Pelzer did not suffer from a learning disability and that he did not establish either of the mental health mitigators. Of course, in a case of dueling experts, it is difficult to project which set of experts the jury or any single juror would have chosen to believe, or even if the jury would have been receptive to the notion that the opinions here, on the evidence presented, properly made out the mitigators. What can be known, however, is that those opinions would have been admissible and become

part of the mix for the jury's consideration; and, even if the jury did not find the mental health mitigators specifically, the additional information was still available for consideration under the catchall mitigator, and in the jury's overall comparative assessment. Noting again the relative paucity of the case in mitigation actually forwarded at trial, we believe that, at a minimum, there is a reasonable probability that at least one juror would have found a stronger case for mitigation under the catchall mitigator. Similarly, if counsel had presented a fuller account of appellee's life history, there is a reasonable probability that a reasonable juror would have given more weight to appellee's life history factors in assessing the catchall mitigator.

Meanwhile, the evidence in aggravation established that appellees and their cohorts kidnapped a 16-year-old youth and held him for ransom before deciding to kill him. Although there was some division on the Court in resolving the direct appeal, concerning the sufficiency of the evidence to prove the torture aggravator and the aggravator involving a killing to eliminate a witness, the other two aggravators – that the victim was being held for ransom and that he died while appellees were committing the felony of kidnapping -- were strongly supported by the evidence. Moreover, in assessing Strickland prejudice, although some members of the direct appeal Court may have been unconvinced respecting certain aggravators, the fact remains that the jury unanimously found all four circumstances beyond a reasonable doubt; contrary to the view of the PCRA court, there is no reason to believe that the **jury** harbored the same doubts about those aggravators that were articulated, as a legal matter, by the Justices ultimately in the minority on those issues.[7]

---

[7] The issue concerning the sufficiency for the aggravators, on this record, was definitively resolved on the direct appeal reargument in Daniels by a 4-3 vote.

This is a strange business, assessing the relative heinousness of murders as against evidence in mitigation. Obviously, a murder can be committed without first subjecting a young victim to the terrorization inherent in confining the youth in the trunk of a car for a mercilessly long period of time, with a sock stuck into his mouth in a manner that could easily cause asphyxiation; there is, to be sure, an extra measure of depravity beyond "mere" murder here. Nonetheless, particularly given the weakness of the case presented in mitigation at trial, and the dictated standard of Sixth Amendment review, we conclude that there is a reasonable probability that at least one juror would view both the mitigation case differently, and the overall penalty judgment differently, and would have decided against the imposition of the death penalty. In our view, there is at least a sufficient prospect of that result as to call into question the basic fairness of the proceeding, in light of counsel's ineptitude. Accordingly, we affirm the PCRA court's award of a new penalty phase hearing as to appellee Pelzer.[8]

B.

We turn now to the Commonwealth's appeal challenging the grant of penalty phase relief to Daniels, on grounds that trial counsel was ineffective in his presentation of mitigation evidence. Trial counsel forwarded a case in mitigation that stressed both

---

[8] There is no need to examine at length appellate counsel's performance on direct appeal in not raising this claim. The Commonwealth argues that this claim is defaulted because trial counsel's ineffectiveness could have been raised on direct appeal by new counsel. However, Pelzer's appellate counsel testified at the PCRA hearing that he believed that he was limited to raising issues preserved on post-verdict motions. N.T., 5/9/02, at 57-59. At the time this direct capital appeal was litigated, this simply was not so. See, e.g., Commonwealth v. Grant; see also supra n.1 (discussing Grant and prior law). In this circumstance, it is appropriate to examine the underlying claim of ineffectiveness on collateral review. Walker, 36 A.3d at 7-8 & n.8; Commonwealth v. Ly, 980 A.2d 61, 101-02 (Pa. 2009) (Castille, C.J., concurring).

disruptions and difficulties in Daniels's upbringing, as well as positive aspects of his life and character, including his conduct following his conviction. Thus, counsel called Daniels's great-grandmother, Evangelist Bertha Williams, who testified that Daniels had lived with her at different points during his childhood. Ms. Williams noted that two of Daniels's siblings were deceased. She also testified that Daniels's father was very cruel to him, beat him, and did not support the family financially. She explained that Daniels moved to California to live with her when he was ten, and that he was successful in high school, attended a year of college but then could not afford to buy books for college. She also testified that following this murder, her great-grandson had become a devout Christian. Daniels testified on his own behalf, confirming that he had become a Christian and that he felt remorse for the victim's death. He also apologized to the victim's mother. Finally, trial counsel offered testimony from the Reverend Moses Ruffin, who was the director of a prison ministry. Rev. Ruffin testified that Daniels had attended all of the services and classes offered by the ministry at the prison and that Daniels spoke often of having changed his life.

In his closing argument to the jury, counsel admitted that this was a "cruel" crime, but he then argued for mercy. Counsel explained that Daniels would have to spend every day for the duration of his life in prison, which is a serious penalty. He then asked the jury what legal authority it had to take a life and argued that extending mercy was consistent with a mind of goodness and fairness. Finally, he focused on the value to society if Daniels was not put to death, since he would be an example of positive change for the other inmates. N.T., 11/13/89, at 138-48. Ultimately, members of the jury found two mitigating circumstances: (1) six jurors found the no significant criminal history mitigator, 42 Pa.C.S. § 9711(e)(1), and (2) the jury unanimously found the catchall mitigator under subsection 9711(e)(8).

At the PCRA hearing, Daniels's mother, Jacqueline Daniels, testified concerning various negative or traumatic events in her son's life history, including that his sister was killed by an automobile when he was twelve, his brother committed suicide, and the family was forced to relocate often because his father gambled, abused drugs and alcohol, and could never pay the rent. Daniels attended ten different schools because of the family's frequent moves. Ms. Daniels also stated that Daniels was often beaten with a belt by his father, once resulting in hospitalization, and his father forced him to stand in a corner, for the rest of the night, "just about every night" after Daniels wet the bed. Ms. Daniels testified that she was not contacted about testifying at the penalty phase and, had she been contacted, she would have cooperated. N.T., 12/10/02, at 140-52.

Daniels also presented expert testimony from Dr. Allen Tepper (Ph.D. in psychology), who testified -- based upon school records, his interview with Jacqueline Daniels (who provided him with the information relayed above), and a mental health evaluation – to an opinion that Daniels suffered from a mixed personality disorder and was dependent upon drugs and alcohol. Dr. Tepper further stated that this diagnosis was supported by the diagnosis in the pre-sentence investigation report, as well as the opinion of the Commonwealth's PCRA expert, Dr. O'Brien, who had diagnosed Daniels as suffering from alcohol and drug abuse.[9] Dr. Tepper also stated his view that the combination of the life history information and the drug and alcohol abuse were relevant to the (e)(2) and (e)(3) mental health mitigators. Dr. Tepper testified that he did not recall ever being contacted by standby counsel, Mr. Drost, in preparation for trial and that he had no notes indicating any such contact. N.T., 5/7/02, at 104, 105.

---

[9] Dr. O'Brien testified on behalf of the Commonwealth at the PCRA hearing in both cases.

On cross-examination, Dr. Tepper noted that Daniels had achieved fairly good grades during 7th and 8th grade and in 10th grade, and he specifically testified that he did not believe that Daniels met the criteria for the (e)(3) mitigator (regarding the ability to conform one's conduct to the requirements of the law). However, Dr. Tepper reiterated his opinion that, "given his (Daniels) makeup, his personality disorder, and his dependency difficulties … he was suffering from what is described as extreme mental or emotional disturbance." Id. at 121-22, 125, 135.

Attorney Houston, an out-of-state practitioner hired by Daniels's family, did not appear at the PCRA hearing; there is no explanation in the record for appellee's failure to call him. Instead, Daniels called Attorney Drost. Drost testified that he reviewed the available discovery and hired an investigator prior to Houston's involvement in the case. Drost also recalled that his private investigator contacted Dr. Tepper, explaining that it was part of his normal routine in capital cases. He further testified that Dr. Tepper did not always issue an expert report. Drost recalled interviewing Jacqueline Daniels, but did not recall whether he had obtained Daniels's school records. Drost recalled discussing both the guilt and the penalty phase with Houston, and specifically remembered discussing Daniels's upbringing with Houston and offering that "bringing out testimony of these types of things would be mitigation." He did not recall that Houston ever provided him a reason why he did not present that evidence, but Drost opined that "Mr. Houston's approach was to rely upon the Almighty…." Drost also testified to his own preferences, i.e., that he would have presented mitigation evidence of Daniels's upbringing, childhood abuse, numerous relocations, and the death of his two siblings during the penalty phase. Drost further explained that he provided all of his notes and relevant information to direct appeal counsel, adding that he also conveyed to

appeal counsel his opinion that "this was perhaps the worst single job of lawyering that I had ever seen." N.T., 12/12/01, at 8-9, 12, 23-24, 50-51, and 70 (redirect).

Daniels testified at the PCRA hearing, discussing that he had been "saved" since the time of his crime and explaining how his prison activities furthered his religious conversion.

The PCRA court opined that trial counsel's penalty presentation focused on Daniels's religious conversion after he was arrested, while presenting very little evidence respecting his pre-crime background. The court further found that Attorney Drost had provided Attorney Houston with significant mitigation evidence that Houston did not ultimately use. The court was persuaded that counsel could have presented more detailed evidence of Daniels's background and, in the court's view, such evidence would not have been inconsistent with the strategy that counsel actually pursued, *i.e.*, focusing upon Daniels's religious conversion and his poor relationship with his father. In the court's view, such a strategy would have "presented a picture of a person who had a terrible childhood but had some potential when in a structured environment such as prison." PCRA court Slip Op., at 27. Furthermore, the court found that Houston's failure to present any testimony from Jacqueline Daniels was unreasonable since Drost had performed the initial investigation and had alerted Houston to the existence of her potential testimony related to Daniels's life history. The court then determined that the evidence of Daniels's abusive upbringing not presented would have altered the sentencing profile presented to the jury. Respecting Strickland prejudice, as noted earlier, the PCRA court's analysis was the same for both appellees.

On appeal, the Commonwealth argues that Attorney Drost conducted a thorough investigation of possible mitigation evidence concerning Daniels's background by interviewing family members. The Commonwealth further notes that Drost knew of the

deaths of Daniels's sister and brother, that Daniels had moved numerous times, and that he lacked a male role model. The Commonwealth further notes that Drost hired a forensic clinical psychologist prior to trial (Dr. Tepper), who evaluated Daniels in preparation for the penalty phase.[10] This information was provided to Attorney Houston when he took over the case.

The Commonwealth avers that counsel then presented an adequate case in mitigation at trial. The Commonwealth emphasizes that Drost "was just as much Daniels'[s'] trial attorney as Mr. Houston," that Drost was actively involved in the case, and that "they were co-counsel[] to Daniels." Brief of Commonwealth at 31. Most important, according to the Commonwealth, is the fact that Drost consulted Dr. Tepper prior to trial and that "while Mr. Houston may not have personally investigated Daniels'[s] mental health via Dr. Tepper, his co-counsel Mr. Drost clearly did." Id. at 33. The Commonwealth argues that Houston, once he assumed the defense, was not required to take the redundant step of contacting Dr. Tepper after he was contacted by Drost. For similar reasons, the Commonwealth argues that Houston's decision not to present testimony from Jacqueline Daniels was not ineffective, as the information counsel presented through Daniels's great-grandmother was similar in content; Jacqueline Daniels's account would have been redundant.

The Commonwealth also contends that producing "more" background testimony of the same basic life history carried a "substantial risk of alienating the jury" as it could have led the jury to believe that Daniels was irredeemable. Instead, the Commonwealth claims, counsel struck a balance by presenting evidence of Daniels's background without repeating the negative information "ad nauseum."

---

[10] Dr. Tepper diagnosed Daniels with mixed personality disorder and drug and alcohol dependency. As noted, there was no report from Dr. Tepper produced for trial and he did not testify at the penalty phase.

In any event, according to the Commonwealth, Daniels was not prejudiced by counsel's alleged ineffectiveness. The Commonwealth argues that Dr. Tepper's diagnosis of mixed personality disorder and drug dependency would not have changed the outcome of the penalty phase. Furthermore, the Commonwealth notes that Dr. Tepper testified at the PCRA hearing that Daniels did not have a mental illness or organic brain damage, and that he had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. Additionally, the Commonwealth argues that the testimony of Jacqueline Daniels was not particularly persuasive, and supported a determination that Daniels was a "normal" child – indeed, he was the first of her children to graduate from high school, he did not give her any trouble or cause trouble in school, and he attended college. For these reasons, the Commonwealth concludes that testimony by Dr. Tepper and Jacqueline Daniels, along the lines of what was produced at the PCRA hearing, would not have changed the outcome of the penalty phase proceeding.

Daniels responds that trial counsel whitewashed his history of childhood abuse and trauma, events which shaped his psychological functioning at the time of the murder. Daniels argues that his parents failed to furnish life's basic necessities, such as shelter, sustenance, love, and emotional support. Instead, he suffered mental and physical abuse at the hands of his father and witnessed similar abuse directed at his brother and mother. Daniels adds that the suicide of his older brother had a "stunning" impact on him and that everything fell apart thereafter. Brief of Appellee Daniels, at 17.

Daniels further notes that some of this information was gathered by Mr. Drost, yet Mr. Houston never presented the information. Furthermore, counsel failed to perform any type of psychological profiling, but instead, Daniels says, chose to rely on "divine intervention," an ineffective strategy.

Daniels further argues that counsel's decision to rely on post-incarceration achievements when there was readily available life history evidence was inadequate. Daniels then avers that the PCRA court correctly concluded that trial counsel did not fully investigate the available mitigation evidence and then make a reasoned strategic decision. Instead, counsel failed to properly prepare for the penalty phase.

Finally, Daniels turns to Strickland prejudice, arguing that his traumatic life experiences resulted in lasting psychological effects. He notes that the prosecutor argued to the jury that there was no mitigation evidence offered at trial other than the "possibility that he may have gotten religion." N.T., 11/13/89, at 122. Echoing the PCRA court, Daniels asserts that the evidence he produced at the PCRA hearing would have altered the sentencing profile presented to the jury. Daniels also contends that the fact that the jury unanimously found the catchall mitigator does not disprove that he was prejudiced, since the jury may have accorded the mitigating circumstances much greater weight had it been exposed to the full mitigating circumstances of his life. For these reasons, Daniels concludes that trial counsel was ineffective for failing to investigate and present additional mitigation evidence, which would have altered the outcome of the proceedings.

For purposes of decision, we will assume that counsel's performance was deficient (although the point is debatable); however, we are not persuaded that Daniels has established that he was prejudiced by counsel's failure to produce additional mitigation evidence along the lines of what was produced at the PCRA hearing. Counsel presented a modicum of evidence to the jury of Daniels's troubled background, but mixed it with an evidence on some of his successes in life, combined with an acceptance of responsibility, an apology, and evidence of Daniels's religious conversion – a point no doubt resonant with many jurors, and a point understandably important

enough to Daniels himself that he repeated it at the PCRA hearing. The jury still returned a unanimous verdict of death. By way of immediate comparison, the additional mitigation evidence adduced at the PCRA hearing was not so different or significant as that proffered by co-defendant Pelzer in his own collateral presentation. Thus, Dr. Tepper opined that Daniels suffered from a mixed personality disorder and substance abuse, testimony that was not as precise or certain as the testimony of Dr. Crown or Dr. Krop, and it is difficult to see how it could have altered the outcome of the penalty proceeding. For example, although Dr. Tepper initially testified that there was evidence to support the Section (e)(3) mitigator, he retracted that view on cross-examination. Similarly, there was no evidence in Daniels's school records to suggest any significant mental health history that warranted, or required, further investigation. Instead, Daniels appeared to be a good student both academically and emotionally: he was a high school graduate and he attended a year of college. We are not persuaded that there is a reasonable probability that the jury, or any one juror, would have concluded that the evidence produced for the PCRA hearing, combined with the mitigation already made available to the jury, warranted a finding that the (e)(2) mental health mitigator existed and, considered with the other relevant penalty evidence, warranted a verdict of life in prison.

Additionally, although Jacqueline Daniels's testimony at the PCRA hearing offered greater insight into Daniels's troubled childhood, the fact remains that similar evidence was already presented to the jury: Daniels's great-grandmother testified that Daniels's father was cruel and beat him. Of course, it is theoretically possible that a juror or two would have given the catchall mitigator some additional weight if Ms. Daniels had testified, but the question the Court must answer is whether the additional testimony by Jacqueline Daniels and Dr. Tepper was weighty enough to the point where

there is a reasonable probability that one juror may have decided against the imposition of the death penalty.

Based on the record of the PCRA proceedings and the trial, we simply cannot conclude that such a reasonable probability existed. The aggravating circumstances demonstrated that Daniels was actively involved in a plan to kidnap a young man, not yet an adult, for ransom. The victim died as a result of the conduct of Daniels and his cohorts, but only after having been cruelly confined in the trunk of a car for twenty-four hours, tied up and with a sock stuffed in his mouth. Given the case in mitigation already presented to the jury emphasizing both Daniels's troubled childhood as well as positive attributes and his religious conversion, and the substantial evidence in aggravation, we do not believe that the marginal additional mitigation evidence produced at the PCRA hearing was sufficient to establish a reasonable probability that the result of the penalty phase would have been different. Under these circumstances, we cannot conclude that the additional mitigating evidence undermines confidence in the jury's verdict. The PCRA court's summary conclusion respecting <u>Strickland</u> prejudice to the contrary cannot stand, and it is hereby reversed.

## V. DANIELS'S ADDITIONAL PENALTY PHASE ISSUES

Having concluded that the PCRA court's award of a new penalty phase to Daniels on the mitigation evidence issue must be reversed, we now address Daniels's additional penalty phase arguments, all of which were rejected by the court below.

### A.

In his cross-appeal penalty phase briefing, Daniels first argues that trial counsel should have objected to the trial court's unconstitutionally vague torture instruction. Daniels argues that the Court has recognized that the torture aggravating circumstance

is unconstitutionally vague absent an appropriate limiting instruction. According to Daniels, the definition of torture given by the trial court could apply to virtually any murder case and failed to narrow the class of persons eligible for the death penalty, in violation of the Eighth Amendment. Brief of Appellee Daniels at 62 (citing Maynard v. Cartwright, 486 U.S. 356 (1988)). Daniels contends that trial counsel had no reason for failing to object to the instruction and he further contends that he was prejudiced by the failure as the jury found the torture aggravator.

The Commonwealth briefly responds that the Court has repeatedly approved of materially identical torture instructions in other cases and rejected the argument that similar instructions are unconstitutionally vague. Thus, the Commonwealth concludes that trial counsel was not ineffective for failing to make a baseless challenge to the torture instruction.

The PCRA court held that prior case law established that a trial court must give a limiting instruction separating the intent to kill from the intent to torture. It then concluded that the instruction by the trial court in this case informed the jury that the infliction of pain must be more than simply the pain associated with murder when it stated that the infliction of pain must be "unnecessarily heinous, atrocious, or cruel." Furthermore, the PCRA court believed that the trial court addressed the principle of separate intent by immediately explaining intent after giving the torture instruction.

The trial court's relevant jury instruction regarding torture reads as follows:

Now, as to torture, torture is the intentional infliction of a considerable amount of pain and suffering on the victim which is unnecessarily heinous, atrocious or cruel manifesting exceptional depravity. Now, by "intent" is meant, a person intends a certain matter if he consciously does or intends to do a certain object, bring about a certain object. Now, intent may be shown by words or by acts or conduct of the parties involved.

N.T., 11/13/89, at 150. The trial court also instructed the jury that the Commonwealth had the burden of proving the aggravating circumstances beyond a reasonable doubt. Id. at 152.

In Pennsylvania, we have indeed generally defined torture as "the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity." Commonwealth v. Nelson, 523 A.2d 728, 737 (Pa. 1987). We further require a trial court to define torture for the jury when the torture aggravator is at issue "in order to channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance that make the process for imposing a sentence of death rationally reviewable"; a jury cannot simply be directed to determine whether the victim was tortured without a definition of the concept. Commonwealth v. Stevens, 739 A.2d 507, 524 (Pa. 1999); see also Nelson, 523 A.2d at 737; Commonwealth v. Wharton, 607 A.2d 710, 723 (Pa. 1992).

The focus of Daniels's argument is that the trial court supposedly provided part of the relevant instruction, but not all, since it failed to specifically inform the jury that in order to find the aggravator a defendant must have the specific intent to torture, which is distinct from the intent to kill. See Stevens, 739 A.2d at 524 (Commonwealth must show beyond reasonable doubt that defendant possessed an intent, separate from intent to kill, to inflict pain and suffering). Daniels cites Nelson for the proposition, a case which pre-dated his trial and which was cited with approval in Stevens.

In Nelson, the Court explained that the torture aggravator must necessarily require more than an intent to kill in order to pass constitutional muster. "Implicit in subsection 8 [torture aggravator] is the requirement of an intent to cause pain and suffering in addition to the intent to kill." Nelson, 523 A.2d at 737. Daniels argues that the trial court erred in failing to instruct the jury as to a requirement of an additional and

separate specific intent to inflict pain and suffering. But, in forwarding his argument, Daniels overlooks that the Nelson Court then cited with approval the instruction that was given in Commonwealth v. Pursell, 495 A.2d 183 (Pa. 1985), which did not make the distinction that Daniels now urges is required. The Pursell Court described the trial court instruction in that case:

> The Court defined torture to the jury as follows: "One of them is the model Penal Code in which they say that the offense or murder committed by means of torture is designed for the defendant who causes a considerable amount of pain and that the language used for this particularly aggravating circumstance is the murder was especially heinous, atrocious, or cruel manifesting exceptional depravity. Also, another place that I felt may be appropriate in trying to define for you torture was in the American Law Reports. These reports stated that since murder is an intentional act, that many courts have determined, regarding murder by torture, a specific intention that the torture murderer has in committing the homicide. It has been held that this is an intention to inflict pain, suffering or both pain and suffering.

495 A.2d at 197 n. 13. As against Daniels's present argument, the instruction issued in this case was materially indistinguishable from the one given in Pursell. Furthermore, we have indicated more recently that the type of instruction given here was a proper statement of the law when it was given. See Commonwealth v. Brown, 786 A.2d 961, 966 (Pa. 2001) (citing with approval instruction in Commonwealth v. Thomas, 561 A.2d 699, 709 (Pa. 1989), which was similar to instruction given here). Viewed in its entirety and in context, the instruction in this case accurately explained what was required to support a finding of the torture aggravator, and counsel cannot be faulted for failing to object to it. As Daniels has not established that trial counsel was ineffective in failing to object to the charge, his layered claim of ineffectiveness also fails.

### B.

Daniels next contends that trial counsel was ineffective for failing to object to the trial court's instruction regarding the witness elimination aggravator, per Section

9711(d)(5). Daniels contends that, on its face, the (d)(5) aggravator is applicable only to the killing of a prosecution witness in a pending proceeding. He finds support for this proposition in Commonwealth v. Crawley, 526 A.2d 334 (Pa. 1987) and Commonwealth v. Caldwell, 532 A.2d 813 (Pa. 1987). He acknowledges that the Court expanded its understanding of the aggravator in Commonwealth v. Appel, 539 A.2d 780 (Pa. 1988), which was decided prior to his trial.

In Appel, the Court held that the (d)(5) aggravator could be applied to circumstances involving future criminal proceedings if there was direct evidence that the killing occurred to eliminate a potential witness. Nevertheless, according to Daniels, the (d)(5) aggravator has not been applied with consistency in Pennsylvania. See Brief of Appellee Daniels, at 65-66, citing to Commonwealth v. Marshall, 568 A.2d 590 (Pa. 1989). Furthermore, Daniels argues that he lacked fair warning that this aggravator could be deemed applicable. Additionally, he contends that the trial court failed to provide the jury with the definition of "direct evidence" and also failed to instruct the jury that the aggravator must be found by proof beyond a reasonable doubt. Daniels notes that trial counsel could have objected to the instruction, pointing out that counsel for one of the co-defendants had raised the issue during the guilt phase. Furthermore, Daniels explains that appellate counsel challenged the evidence in support of the aggravator on direct appeal, but failed to raise a challenge to the instruction itself; in that regard, Daniels says, appellate counsel was ineffective.

The Commonwealth responds that the language of the statute is not so limiting, but applies to "any" grand jury or criminal proceeding. Furthermore, the Commonwealth argues that the Court's Appel decision put Daniels on notice that the (d)(5) aggravator could apply to potential witnesses in future criminal proceedings, as long as it was supported by direct evidence. The Commonwealth also accurately notes that the trial

court made clear that the aggravating circumstances had to be established by the Commonwealth beyond a reasonable doubt (citing N.T., 11/13/89, at 152). Additionally, the Commonwealth argues that the jury had been given the definitions of "direct evidence" and "circumstantial evidence" during the guilt phase jury instructions. Finally, the Commonwealth argues that the Court has consistently held that the (d)(5) aggravator can apply to potential witnesses since Appel, and stresses that the sole case cited by Daniels in fact applied the aggravator consistently with Appel.

The PCRA court concluded that this issue was barred because it was already litigated on direct appeal.

The trial court instructed the jury as to the killing of a prosecution witness aggravator as follows:

> Now, whether or not under number five – the victim was a prosecution witness – it would depend on whether you find by direct evidence that the Defendant in effect, either/or both Defendants in effect brought about the death of Alexander Porter with the intent to prevent his being a witness against them in this case. They must do this by direct evidence and not circumstantial evidence.

N.T., 11/13/89, at 150.

The Appel Court explained the distinction between the circumstances in Crawley and Caldwell and Appel, stating that the Court had earlier "superimposed" a pending proceeding requirement onto the (d)(5) aggravator in order to limit the application of the aggravator to circumstances where the "requisite animus," *i.e.*, the intent to remove the victim as a pending witness, was present. The Court further explained, however, that where the evidence suggested that the purpose of the killing was to eliminate a potential future witness, as was the case in Appel, then the (d)(5) aggravator could be properly invoked. The Court then explained that, while the aggravator could be supported by circumstantial evidence if the murder was of a witness in a pending proceeding, the

killing of a potential witness in a not-yet-pending proceeding required support by direct evidence. See Appel, 539 A.2d at 784 n.2.

In this case, our analysis is limited to the propriety of the trial court's instruction, as the sufficiency of the evidence supporting the aggravator was already finally litigated on direct appeal. See Daniels, 612 A.2d at 399-400. The trial court properly followed the holding in Appel by instructing the jury that the (d)(5) aggravator could only be found if it was supported by direct evidence, as opposed to circumstantial evidence. The instruction was a clear iteration of the recently decided Appel decision. Daniels's argument that he lacked fair notice that the aggravator could be applied to him is meritless, as Appel was decided six months before the September 1988 murder of Alexander Porter. Additionally, as the Commonwealth notes, the jury was earlier instructed as to the definition of direct evidence, and was told that it was the Commonwealth's burden to establish the aggravating circumstances beyond a reasonable doubt. In sum, Daniels has not proven counsel ineffective for failing to pursue this claim, and his derivative, layered claim of appellate counsel necessarily fails.

C.

Daniels next forwards a claim based on Commonwealth v. Lassiter, 722 A.2d 657 (Pa. 1998) (plurality), a case decided nearly ten years after the trial in this case. Daniels argues that "all parties agree" that he did not personally inflict any gunshot wounds upon the victim. He explains that Lassiter was clear that the killing in the perpetration of a felony aggravator under Section 9711(d)(6) does not apply to mere accomplices. Daniels argues that Lassiter merely clarified the statute and did not change it, as the discussion in Lassiter was this Court's first pronouncement on the substance of the (d)(6) aggravator. Daniels then contends that, prior to his trial, the

U.S. Supreme Court in <u>Enmund v. Florida</u>, 458 U.S. 782 (1982), held that a killing in the perpetration of a felony aggravator could only apply where the evidence demonstrated that a participant in a felony murder either killed or attempted to kill the victim, or intended that a killing take place, or that lethal force be employed. According to Daniels, under <u>Enmund</u>, an instruction was required to inform the jury that capital culpability must be based on the accomplice's proven desire, *i.e.*, an intent to bring about the victim's death.

Daniels also contends that even if <u>Lassiter</u> reflected a change in the law, such a rule would not bar relief here because Attorney Drost testified that he discussed with Attorney Houston a theory that the (d)(6) aggravator could not apply to an accomplice, and yet Houston failed to object. Thus, Daniels says, trial counsel was put on notice of the viability of a challenge to the (d)(6) aggravator. Daniels then maintains that the prejudice arising from the failure to object to and negate the aggravator is self-evident. Finally, Daniels contends that appellate counsel was ineffective for failing to raise the record-based issue on direct appeal.

The Commonwealth forwards two primary arguments in response. First, the Commonwealth contends that there was evidence that Daniels was a principal in the murder and not merely an accomplice, citing as proof this Court's opinion in the first collateral appeal, where we stated that "the jury could have found that both actors were principals based upon the evidence presented … the evidence inculpated both men depending on whose version of the shooting the jury believed." <u>Daniels and Pelzer</u>, 963 A.2d at 432, n.17. Second, the Commonwealth notes that counsel's effectiveness must be evaluated using the standards in effect at the time of trial. At the time of trial here, <u>Lassiter</u> had yet to be decided, and trial counsel may have concluded that any <u>Lassiter</u>-type objection would have been futile. Indeed, the Commonwealth notes that the Court

has upheld the sentencing of a defendant, prior to Lassiter, where the jury found the (d)(6) aggravator based on accomplice liability. See Brief of Commonwealth at 56 (citing Commonwealth v. Spotz, 896 A.2d 1191, 1239 (Pa. 2006)).

The PCRA court concluded that the ruling in Lassiter constituted a change in the law and that counsel cannot be ineffective for failing to predict that change. PCRA court opinion, at 21 (citing Spotz, 896 A.2d at 1238-39). Accordingly, the court determined that trial counsel was not ineffective for failing to object to the (d)(6) aggravator.

Although the members of the Court have not all been of one view on the issue, the PCRA court's conclusion was consistent with this Court's prevailing case law, concluding that Lassiter reflected a change in the law. See Commonwealth v. Cox, 983 A.2d 666, 702 (Pa. 2009). However, the wrinkle here is the fact that Attorney Drost testified that he had a conversation with trial counsel in which he outlined a possible challenge to the (d)(6) aggravator. Nevertheless, even assuming that Drost's conversation could be construed as enough to trigger an obligation on counsel's part, the instruction that was actually given in this case raises no concern under Lassiter.

The Court has explained that Lassiter involved jury instructions related to the (d)(6) aggravator that were given in the passive voice, i.e., that the "killing was committed in the perpetration of a felony." Commonwealth v. Rega, 70 A.3d 777, 793 (Pa. 2013) (citation omitted). Such concerns are not raised, however, when the instruction tracks the language of the statute and advises the jury that the aggravator applies when the "defendant committed a killing while in the perpetration of a felony," as the court has "conveyed the essential information in an understandable form." Id.

In this case, the trial court quoted the language of the statute when instructing the jury with regard to the (d)(6) aggravator, stating that the aggravator applied when "[t]he Defendant committed a killing while in the perpetration of a felony." N.T.,

11/13/89, at 150. Daniels's current argument does not acknowledge that the language of the jury instruction tracked the language of the statute and, instead, focuses on the fact that he himself did not pull the trigger. His argument necessarily assumes that the jury could only have found him liable as an accomplice because of that fact. Daniels further contends that because there was no indication that the jury actually found him to be the principal "shooter," this Court cannot perform an analysis of the trial evidence, without usurping the jury's function. Daniels concludes that it is not this Court's role on collateral review to speculate as to how the jury could have determined the facts.

The Commonwealth, however, proffered its own version of the facts, providing the jury with its own theory of the case in which Daniels was a principal. As in Rega, the Commonwealth was entitled to rely on the strength of its own case in pursuing this aggravator. Additionally, the fact that the trial court gave the appropriate jury charge, requiring the jury to find that "the Defendant," i.e., Daniels, minimized any uncertainty. Id. at 794. The issue of trial counsel ineffectiveness is without merit and the layered claim of appellate counsel ineffectiveness necessarily fails.

D.

Daniels next contends that appellate counsel was ineffective for failing to raise a claim that he was entitled to a "life means life" instruction pursuant to Simmons v. South Carolina, 512 U.S. 154 (1994) (plurality), a case decided after his trial. Daniels avers that the Commonwealth injected future dangerousness into the proceedings when it questioned him on cross-examination as to whether "you said on direct testimony something about wanting to go back out on the street. You still hope that you are going to go back out there on the street and you will do everything that you can to make sure you do, right?" N.T., 11/13/89, at 68. According to Daniels, this line of questioning implied that he would impose a threat upon release. Daniels further argues that the

Simmons claim became available because it was decided during his direct appeal proceedings, and thus, appellate counsel should have raised a claim of ineffectiveness related to trial counsel.

The Commonwealth responds that the brief exchange cited by Daniels did not amount to placing Daniels's future dangerousness at issue. In any event, according to the Commonwealth, Simmons is inapplicable to this case, as it was decided nearly five years after the trial, it announced a new rule of law, and trial counsel cannot be held ineffective for failing to anticipate a change in the law.

The PCRA court concluded that the Commonwealth did not invoke Daniels's future dangerousness by this brief exchange.

This Court has been clear that an ineffectiveness claim premised on Simmons will not be available to defendants whose trial was completed prior to the decision. Commonwealth v. Fletcher, 986 A.2d 759, 801 (Pa. 2009); Commonwealth v. Ly, 980 A.2d 61, 97 (Pa. 2009). Daniels attempts to avoid application of this principle by placing the ineffectiveness at the feet of appellate counsel, arguing that Simmons was decided and available during the pendency of his direct appeal. Even assuming that appellate counsel could have secured review of the issue via relaxed waiver, the claim would have failed because we agree with the Commonwealth and the PCRA court that the brief exchange did not implicate Daniels's future dangerousness. Instead, when read in context, the question merely suggested that Daniels's guilt phase testimony was inconsistent with his police statement, intimating that he would lie, *i.e.,* "do everything" that he could to get back on the streets. Appellate counsel was not obliged to read the exchange out of context, or to torture the language of the exchange in order to manufacture an appellate issue. Accordingly, this claim of appellate counsel ineffectiveness fails.

Daniels next argues that trial counsel was ineffective for failing to object to the joint penalty phase proceeding. According to Daniels, the joint sentencing did not comport with the "individualized sentencing" mandated by the U.S. Supreme Court. Furthermore, Daniels continues, severance was particularly warranted in this case because the defenses were antagonistic – each defendant blamed the other for the shooting. Daniels additionally argues that the greater quality and quantity of mitigation evidence offered by Pelzer harmed him, especially since the trial court did not give repeated instructions on individualized sentencing determinations.

The Commonwealth responds that "individualized sentencing" does not mean that Daniels was entitled to a separate penalty phase proceeding. Instead, the term merely means that Daniels was entitled to a determination of his sentence based on his individual characteristics and the circumstances of the crime. In this case, Daniels and Pelzer presented separate penalty phase evidence and arguments. Additionally, appellees argued for the application of different mitigating circumstances and the trial court specifically instructed the jury that they had to make two distinct findings. The Commonwealth also asserts that alleged hostility between co-defendants does not require severance. Indeed, the Commonwealth argues that this Court has indicated that the fact that defendants have conflicting versions of the facts is a reason for, rather than against, a joint trial.

The PCRA court held that appellees were sentenced individually and both presented separate arguments and evidence. The court also indicated that different mitigation evidence was produced in each case and the trial court specifically instructed the jury to consider the sentence of each appellee separately.

We see no error in the PCRA court's determination. The U.S. Supreme Court has broadly held that individualized sentencing is required in all capital cases in order to satisfy the Eighth Amendment. Lockett v. Ohio, 438 U.S. 586, 602, 605 (1978). The Court has further explained that individualized sentencing is satisfied when the jury is permitted to consider all of the relevant mitigating evidence. Blystone v. Pennsylvania, 494 U.S. 299, 307 (1990). In conjunction with these directives from the High Court, this Court has indicated that there is no constitutional right to an individual sentencing hearing, so long as each defendant receives an individualized sentence and the jury is free to consider the mitigation evidence. Commonwealth v. Simpson, 66 A.3d 253, 275 n.27 (Pa. 2013); Commonwealth v. Bond, 985 A.2d 810, 824 (Pa. 2009); Commonwealth v. Romero, 938 A.2d 362, 381 (Pa. 2007); Commonwealth v. Hughes, 865 A.2d 761, 815 (Pa. 2004). Additionally, in order to be entitled to Strickland relief, the petitioner must demonstrate a reasonable probability that the outcome of the proceedings would have been different had counsel moved for, and secured, a severance. See, e.g., Romero, 938 A.2d at 381.

In this case, appellees offered individual mitigating evidence. Daniels pursued four mitigating circumstances to the jury: his lack of prior criminal history, his mental capacity, his age at the time of the crime, and the catchall mitigating circumstance. Pelzer pursued four mitigating circumstances as well: his lack of prior criminal history, the fact that he was acting under extreme duress at the time of the crime, his age, and the catchall mitigator. Additionally, the trial court presented the jury with two separate sentencing forms and instructed the jury that it was obliged to "make two findings." N.T., 11/13/89, at 156. Daniels's preference for a separate sentencing proceeding is not the same as a right to such a process. In this case, he was accorded the individualized sentencing process that is required by the Eighth Amendment, and thus

counsel cannot be deemed ineffective in failing to object to the joint proceeding. Moreover, and for similar reasons, Daniels has not demonstrated <u>Strickland</u> prejudice. Accordingly, this claim of trial counsel ineffectiveness fails, as does the derivative claim related to appellate counsel.

F.

Daniels next contends that trial counsel was ineffective for failing to object to the prosecutor's inflammatory closing argument. Daniels states that a capital sentence cannot stand when it results from prosecutorial comments which mislead the jury into imposing death for impermissible reasons. According to Daniels, the prosecutor's argument directed the jury to ignore mercy and mitigation evidence and to focus instead on irrelevant factors, such as a comparison to the victim. Daniels avers that the prosecutor mocked his religious activities, and dismissed his mitigation evidence as an "excuse" and a "cop-out." Separately, he contends that the prosecutor argued to the jury that this was not a case for mercy by improperly imploring the jury to "show [Daniels] the same mercy they showed to Alexander Porter," in "taking him to the park … and le[aving] him out there like a piece of trash." N.T., 11/13/89, at 123-24. Daniels concludes that the cumulative effect of the prosecutor's argument was to undermine his mitigation evidence and derogate the concept of mercy, infecting the sentencing phase with unconstitutional unfairness.

The Commonwealth responds that a prosecutor in a capital murder case can be an advocate and may urge the jury to reject a defendant's mitigation evidence in favor of imposing the death penalty. Furthermore, the Commonwealth contends that this Court has consistently rejected claims challenging the propriety of the prosecutor asking the jury to show a capital defendant the same mercy that he showed to his victim. The Commonwealth also contends that the prosecutor's comment on Daniels's "jailhouse

conversion" was entirely appropriate given that the evidence suggested that the conversion occurred only after he was arrested and incarcerated for the instant murder.

The PCRA court concluded that the prosecutor was "within reasonable bounds," as it is was within the scope of a prosecutor's closing argument to question the applicability of mitigating circumstances. Similarly, the court concluded that the prosecutor's mercy comment was merely oratorical flair and did not entitle Daniels to relief. See PCRA court Slip Op., at 16 (citing Commonwealth v. Freeman, 827 A.2d 385, 415 (Pa. 2003)).

The PCRA court's reasoning was sound; counsel cannot be deemed ineffective for failing to forward the objections Daniels now identifies. It is well-settled that a prosecutor in closing argument is afforded reasonable latitude and is permitted to employ oratorical flair in arguing in favor of death. It is also not improper for the prosecutor to urge the jury to view a defendant's mitigation evidence with disfavor. See Commonwealth v. Elliott, 80 A.3d 415, 443 (Pa. 2013); Commonwealth v. Chmiel, 30 A.3d 1111, 1181 (Pa. 2011). In order to constitute a deprivation of due process, the alleged "misconduct" by the prosecutor must be of sufficient significance to deprive the defendant of a fair trial. Chmiel, 30 A.3d at 1181. Fair commentary on the defense case hardly meets that standard. Finally, with regard to mercy, in Freeman, this Court noted that we had "consistently found permissible similar statements asking the jury to show the defendant the same mercy that he showed his victim." Freeman, 827 A.2d at 415 (collecting cases); Chmiel, 30 A.3d at 1182.[11]

The Court has reviewed the prosecutor's closing argument in its entirety, and then focused on the select portions of the argument that Daniels specifically complains

---

[11] We recognize that Mr. Justice Saylor has expressed a contrary view on this point. See Freeman, 827 A.2d at 418 (Saylor, J., concurring and dissenting).

about. The argument directed the jury's attention to the aggravating circumstances and argued why the mitigating circumstances should be rejected. The prosecutor urged the jury to view Daniels's mitigation evidence with disfavor. This line of argument was entirely within the range of argument we have previously permitted.

The prosecutor then argued that the jury should not show appellees mercy, by stating that "this [was] not a case in which mercy should be shown…. Why don't you show them the same mercy that they showed Alexander Porter." N.T., 11/13/89, at 123. The prosecutor continued by noting that appellees had taken everything important from the victim, "then when they are done with him they take him to the park, either there or another place and shot him and left him lying there like a piece of trash." Id. at 124. Again, the Court has held on multiple occasions that it is permissible for the Commonwealth to ask the jury to show the defendant the same mercy he showed the victim.

In any event, Pelzer's counsel objected and Daniels's counsel later joined the objection. The trial court overruled the objection, stating that counsel would have the opportunity to respond. Daniels's counsel in fact did respond to the prosecutor's argument, urging the jury to exercise mercy because Daniels would be incarcerated for the remainder of his life, and Daniels's religious conversion was of value to society. Id. at 141-14. On this record, Daniels's claim of trial counsel ineffectiveness plainly fails and his derivative claim of appellate counsel necessarily fails.

## VI. CUMULATION CLAIM

Finally, Daniels argues that the cumulative nature of the ineffectiveness claims he has raised prejudiced him, warranting a new trial.[12] This Court has rejected three of Daniels's ineffectiveness claims solely on the basis of a lack of prejudice: the Brady claim related to the forensic report, the layered Strickland claim arising from the trial court's use of the court crier to inform the jury that it would be re-instructed the next day, and the layered Strickland claim involving mitigation evidence at the penalty phase.

This Court has recognized that if multiple instances of deficient performance are found, the assessment of Strickland prejudice may be properly premised upon cumulation. See Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009). We have rejected two guilt phase claims on grounds of "no prejudice." Notably, the Brady claim thus rejected was a small part of a much greater claim faulting counsel for failing to challenge the cause of death -- an argument forwarded, thoroughly discussed, and rejected during the first collateral appeal, as we have explained at length above. The layered Strickland claim respecting the court crier, meanwhile, did not implicate substantive matters, and the potential for prejudice was minimal, if not non-existent. The only issue of any consequence resolved on "no prejudice" grounds was the layered Strickland penalty phase issue related to mitigation evidence. This Court has thoroughly discussed the issue above. Because the other claim resolved on prejudice grounds did not implicate the merits of the penalty proceeding, there is nothing material to cumulate. Thus, this claim fails.

---

[12] Pelzer raises a similar claim of cumulation, which would be relevant to assessing only guilt phase prejudice since we have affirmed the award of a new penalty phase. However, only Pelzer's Brady claim related to the forensic report was resolved solely on grounds of an absence of prejudice, and thus, there are no claims to cumulate related to Pelzer.

## VII. MANDATE

For the foregoing reasons, the PCRA court's order awarding Kevin Pelzer a new penalty phase hearing, but denying him guilt phase relief, is affirmed. The PCRA court's order awarding Henry Daniels a new penalty phase hearing is reversed and his PCRA petition is hereby dismissed.[13]

Jurisdiction in all four appeals is relinquished.

Messrs. Justice Eakin and Baer, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Justice Saylor files a concurring and dissenting opinion.

---

[13] The Prothonotary of the Supreme Court is directed to transmit the complete record of Henry Daniels' case to the Governor pursuant to 42 Pa.C.S. § 9711(i).